The People *against* The Supervisors of Chenango.

suming, therefore, to determine whether the 12th section of the act under which this company was organized does or does not authorize such an arrangement, so as to make it obligatory upon the parties while it was executory, still having been performed in good faith, it can not now be rescinded and a different agreement substituted in its place.

The judgment of the superior court should I think be affirmed.

Judgment affirmed.

8 317
128 361
8 317
148 556

THE PEOPLE, on the relation of Scott, Lieutenant Colonel of the Forty-First Regimental District, *against* THE SUPERVISORS OF CHENANGO.

THE SAME, on the relation of Humphrey, Commander of the Forty-Third Regimental District, *against* THE SAME.

Where an objection to the validity of a law arises from a failure by the legislature to comply with the provisions of the constitution which is not apparent by the act itself, it can only be taken advantage of by alleging it distinctly in the pleadings.

The presumption is that a law published under the authority of the government, was correctly passed so far as it relates to matters of form.

The provisions of the constitution requiring three-fifths to form a quorum on the passage of bills to impose taxes, have no reference to the passage of a military law by which a *commutation tax* is imposed upon the uruniformed militia in lieu of militia service. Such commutation is not a tax within the meaning of Article VII, § 14 of the constitution.

It is not necessary that the presiding officers of either house of the legislature should certify that an act was passed by a majority of all the members elected. This is presumed, and the fact can not be questioned where no specific issue has been joined upon it.

The "Act for the enrollment of the militia, &c.," passed April 16, 1851, was passed in the manner required by the constitution.

The People *against* The Supervisors of Chenango.

It is not in conflict with the constitution of the United States or of any act of congress.

The requirement that the yeas and nays shall be taken upon the final passage of a bill and entered on the journal, (*Cons. Art. III, § 15*,) is complied with in either house when a bill has been passed in that manner, and subsequently amendments have been passed in the same manner, which upon being disagreed to by the other house, are receded from by a vote without calling the yeas and nays.

This requirement of the constitution is directory merely.

The certificate of the presiding officers of each house of the legislature required by the Laws of 1847, p. 276, where a bill requires three-fifths of the members elected to form a quorum for its passage, is only presumptive evidence of the fact. If the certificate is omitted, the fact that three-fifths were present at the final passage of the bill may be shown by other evidence.

Where the Supervisors of a county have neglected to perform any duty required of them at their annual meeting, they may be compelled by mandamus to meet again and perform it. They can not by their neglect nullify a statute imposing duties upon them.

The board of Supervisors of Chenango county, at their annual meeting in 1851, neglected to issue warrants for the military commutation. The supreme court issued a mandamus requiring them to meet and issue the warrants. *Held* that the mandamus was properly issued.

These causes came before this court on writs of error to the supreme court in the sixth district.

The board of supervisors of Chenango, at the annual meeting held on the second Monday of November, 1851, refused to issue warrants for the collection of the tax provided by the seventeenth section of the "Act for the enrollment of the militia, &c.," passed April 16, 1851. On the application of the relators, in each action, writs of alternative mandamus were issued to the board of supervisors, requiring it to reassemble and cause the military roll of the towns within each of the relators' military commands respectively, to be compared with the assessment rolls, and to issue warrants for the collection of the tax required by the act, or to show cause at a general term at Madison, &c.

The board made a return to each writ, that it had met and refused to issue the warrant required thereby, for reasons stated in the return. In the first case these were as follows, because:

The People *against* The Supervisors of Chenango.

" 1. The said military tax of fifty cents is not assessable at all during the year 1851. The said act passed April 16, 1851, not having taken effect until the first day of January, 1852.

" 2. That the said military tax of fifty cents, if assessable at all during the said year 1851, (which is denied,) it could only by the said military act be assessed at the annual November session, 1851, and could not by law be assessed at the special session so as aforesaid held, on the 29th day of December, 1851, in pursuance with the commands of said alternative mandamus; and that the said relator should have procured and served his alternative mandamus upon said board, before the said annual November session finally adjourned, to have accomplished his desired object, and to have made it effectual for any purpose, because so far as the said act of April 16, 1851, is concerned, the powers and duties of said board were exhausted and ended as soon as the said annual November session of 1851, was adjourned, *sine die.*

" 3. Because the assessment rolls and warrants duly signed by said board annexed thereto for the collection of the general tax in the several towns aforesaid, were, on or about the 26th day of November, 1851, (that being the day of the final adjournment of the annual session,) duly and legally issued to and placed in the hands of the collectors of the said several towns respectively, and that said collectors respectively had previous to said December 29, 1851, collected a large portion of said general tax, and that there is no power given by said military act, or by any law of the land for the said board of supervisors to obtain possession of said assessment rolls and warrants annexed thereto, for the purpose of annexing thereto a direction to collect said military tax of fifty cents according to the provisions of the 17th section of said act of April 16, 1851, and could not by law obtain possession of the same, nor comply with said 17th section of said act.

" 4. Because the said board of supervisors have not

power or right by law to alter, add to or detract from the said assessment rolls and warrants for the collection of the general county tax in said towns, now in the hands of the collectors of the said several towns respectively, said warrants having on the said 29th day of December, 1851, been so in part collected, and rights of various individuals having accrued and been fixed by virtue of and under the same, there being no power to do this only when originally issued, and before placed in the hands of said collectors of said towns respectively.

" 5. Because there is no power or authority given by said military act or any other law of the land, to issue entire new warrants to the said collectors of said several towns for the collection of said military tax of fifty cents, if the same had been assessed at said special meeting on the 29th day of December last; but only to annex such directions to the warrants issued only at the annual meeting for the collection of the general county tax in said several towns, and if any such new warrant had been issued as required, it would have been without authority and void.

" 6. Because the said board of supervisors had no power or authority over the assessment rolls filed with the town clerks of said several towns previous to said 27th of December, 1851, and could not by any law of the land obtain possession of them so as to comply with said military act of April 16, 1851.

" 7. Because if said board had illegally issued any such warrants as required by said alternative mandamus at said special session of December 29, 1851, to the collectors of said several towns respectively, it would have been impossible for them to have collected said military tax as required by law; for the said warrant for the collection of said general tax had been issued more than a month previous to said special meeting of December 29, 1851, and made returnable on the 1st day of February, 1852, and said collectors could not have collected said military tax

by advertising thirty days as required by law, and no person upon whom said military tax was imposed would be compelled by law to pay the same, unless said collectors should proceed according to law for the collection of the same; nor would any person against whom said military tax was imposed, be compelled by law to pay the same if he has already paid his general tax previous to the issuing of said military warrant. Because by law said persons upon whom the said fifty cents tax was imposed, have the privilege of paying the same when they paid their general tax, and could not by law be compelled to pay it at any subsequent time. Neither could the said collectors of said towns be compelled to receive any such warrant if any had been issued at the special session of December 29, 1851, because they were not authorized by law.

" 8, And lastly. Because if said board had assessed said tax, and issued the warrants as required by said alternative mandamus, it would have been contrary to law, illegal and void.

In the second case, the additional reason was given by the board of supervisors in the eighth ground of refusal to obey the writ, " The said law of· April 16, 1851, being oppressive and unconstitutional in its passage, and having remained so ever since."

Demurrers to the returns were put in, raising issues upon the several objections urged by the defendants, and the people joined in demurrer. The causes were heard upon the demurrers at a general term held in Madison county, in May, 1852, when judgment was given upon the demurrers in favor of the plaintiffs, and directing the issuing of a peremptory mandamus with costs against the board of supervisors.

They brought writs of error.

Both causes were submitted on written argument

*Southward & Pritchard* for the plaintiffs in error
Sel. 1V.—41.

I. The military tax can be assessed only at the annual meeting of the board of supervisors. Sections 16 and 17 of the act provide that the tax shall be collected " at the same time and in the same manner as other taxes are collected in the said county, &c." The mandamus required the plaintiffs in error to collect it at a different time, and after the other taxes were collected.

II. The board of supervisors could not obey the writ. They had parted with the possession of the assessment rolls.

III. The law is unconstitutional, both in its *passage* and in its *provisions*.

*First.*—The law is unconstitutional in its passage, for the following reason:

The ayes and noes on its final passage were not taken and entered on the journal. *Cons. Art. III,* § 15. The fact that it was not passed in the manner required by this provision appears from the senate journal for 1851. It is there shown that the bill was in the first place passed by the senate by a vote of 21 yeas to 2 nays, and then sent to the assembly where it was amended. It was then returned to the senate, and the question whether the senate would agree to the amendments of the house was decided in the negative. The senate then added certain amendments to the bill, when it was again sent to the assembly where the amendments were disagreed to. A committee of conference was then appointed, which recommended that the assembly adopt the senate amendments, except two which it recommended the senate recede from. The senate adopted the report, and receded from the two amendments without a vote by yeas and nays. (*Senate Journal,* 1851, pp. 292, 525, 541 and 574.)

*Second.*—On the final passage in either house of the legislature, of every act which *imposes,* continues or revives *a tax,* or creates a debt or charge, or makes, continues or revives any appropriation of public or trust money, or property, or releases, discharges or commutes

any claim or demand of the state, the question shall be taken by ayes and noes, which shall be duly entered on the journals, and three-fifths of all the members elected to either house shall in all such cases be necessary to constitute a quorum therein. (*Cons. Art. VII,* § 14.)

This bill does impose a tax, and three-fifths of all the members of the senate and assembly do not appear to have been present at its final passage. It has a certificate as follows: "*A majority* of all the members elected to the senate and assembly voting therefor, and *two-thirds of all members present* concurring." This certificate does not show that more than a bare majority were present, and if all of this bare majority concurred, *two-thirds of all present* would have concurred, and still it would not appear that three-fifths of each house were present.

*Third.*—The act is unconstitutional, as in conflict with the law of congress of May 8, 1792, entitled " An act more effectually to provide for the national defense by establishing a uniform militia throughout the United States." By that act, passed under the power vested in congress by the constitution, all citizens between the ages of 18 and 45 with certain exemptions, are required to be enrolled in the militia. The law in question is in conflict with the act of congress in several of its provisions. It exempts a large class of the militia from enrollment, the duty of providing themselves with proper military accoutrements, the acquiring a proper knowledge of military discipline, and a constant readiness for military duty contemplated by the latter.

*H. R. Mygatt* for the defendants in error,

WILLARD, J. — The plaintiffs in error insist that the ac of April 16, 1851, entitled an act for the enrollment of the militia, &c., is unconstitutional, both in the mode in which it was passed, and in its subject matter, apparent on the

face of the act. If either of these grounds be established, the judgment of the court below should be reversed.

The objection on the score of form is divided into three heads; 1st. The question on the final passage of the act was not taken by ayes and noes. 2d. The ayes and noes were not duly entered upon the journal; and 3d. Three fifths of all the members elected to the legislature were not present at its final passage.

The first answer to these objections is, that the plaintiffs in error are not in a condition to raise either of them. Where the objection to the validity of a law springs out of the failure of the legislature to comply with the provisions of the constitution, which is not apparent upon the act itself, it should be distinctly set forth in the pleadings, or in this case in the return. The adverse party should have an opportunity to controvert the allegation, and to prove a due conformity on the part of the legislature with the requirement of the constitution. The legal presumption is that a law, published under the authority of the government, was correctly passed, so far at least as relates to matters of form. (*Thomas* v. *Dakin,* 22 *Wend.* 9; *Hunt* v. *Van Alstyne,* 25 *Wend.* 608.) It is not averred in the return, that the question on the final passage of the act was not taken by ayes and noes, or that the ayes and noes were not duly entered in the journal, or that three fifths of the members elected were not present at its passage. It is merely asserted in the return, that the law was oppressive and unconstitutional in its passage. No fact is stated which brings it in conflict with the constitution.

The next answer is that the act in question does not belong to that class of laws, requiring the presence of three fifths at its passage. For the general purposes of legislation a majority of each house constitutes a quorum to do business. (*Const. Art.* 3, § 10.) The assent of two thirds of the members elected to each house is only requisite in bills appropriating the public money or property for local or private purposes. (*Id. Art.* 1, § 9.) And three

fifths are required to form a quorum only on the final pas
sage in either house of acts which impose, continue or
revive a tax, or create a debt or charge, or make, continue
or revive any appropriation of public or trust money or
property, or release, discharge or commute any claim or
demand of the state. And no bill can be passed unless by
the assent of a majority of all the members elected to each
branch of the legislature. (*Con. Art.* 7, § 14, *and ib.
Art.* 3, § 15.) The act in question does not fall within
the class which requires the majority of two thirds. It
does not appropriate the public moneys or property for
local or private purposes. Nor does it belong to the class
which requires for a quorum, the presence of three fifths
of all the members elected to either house. (*Art.* 7, § 14.)
It neither imposes, continues or revives a tax, or creates
a debt or charge, or makes, continues or revives any
appropriation of public, or trust money or property, or
releases, discharges or commutes any claim or demand of
the state. It substitutes the payment of fifty cents, by all
able bodied white male citizens between the ages of eighteen
and forty-five, subject to military duty in this state, and
not doing duty in the uniformed militia, for the services
on parade formerly required, and in lieu of the fines for
nonperformance of military duty formerly exacted, and
which were thereby abolished. It is called, indeed, a
*commutation tax*, and the machinery for the collecting of
the general taxes, is adopted to enforce it. But it is not a
tax within the meaning of the 14th section of article 7 of
the constitution. To commute for military services by the
payment of a sum of money, is analogous to the practice
which has long prevailed in this state, of commuting for
highway.labor. See *R. L. of* 1801, 591, § 8; 2 *do. of* 1813, *p.*
272; 1 *R. S.* 509, § 35. The same principle has long pre-
vailed in our militia laws. It may be seen in the act
of April 7, 1801, (1 *K. & R.* 503,) to organize the militia,
when a commutation tax of three dollars a head was
collected of the Quakers in lieu of military duty, and the

same machinery for collecting it, if not voluntarily paid, was adopted as in the act under consideration. (*Ib.* § 36.) Nor is the appropriation of the fund to military purposes, for the benefit of the militia of the county, an appropriation of public or trust money, within the meaning of the constitution. An appropriation of fines and commutation money, under our acts relative to highways, for the improvement of the roads in the town or road district, and of military fines and commutations for the benefit of the militia, has long been a part of the policy of our laws. It existed without complaint, at the adoption of the last constitution, and for forty years before, and there is no reason to believe that any abuses in the system were known to the convention, or led to the adoption of the 14th section of the 7th article. That section was framed to guard against a class of abuses of an entirely different character.

In adverting to the debates in the constitutional convention of 1846, (*Argus Rep.* 355 *et seq. and Atlas Report,* 461, *et seq.*,) it will be seen that on the 30th July, Mr. Hoffman made two reports, one of which, containing seven sections, was entitled " Of the existing debts and liabilities of the state, and to provide for the payment thereof," and the other, of seven sections, entitled " Of the power to create future state debts and liabilities and in restraint thereof." The first report, after much discussion and modification was finally adopted and forms the first seven sections of the 7th article of the constitution. The second report was adopted without alteration, and forms the last seven sections of the same article. I do not find that either of these last sections met with any opposition in the convention, or that they gave rise to any discussion. By the rule for construing statutes and acts of public bodies, the *taxes* spoken of in the 14th section of the 7th article, which the legislature are prohibited from imposing, continuing or reviving, unless three fifths of all the members elected to either house are present when the final vote is

taken, means such tax as is elsewhere spoken of in the same article; viz.: a tax general in its operation and coextensive with the state. It would do violence to the section to suppose that it had reference to the commutation tax, so called in the military law, which operates only upon a small class of persons, and which is a mere substitute of money for military duty.

While this law did not require for its passage the presence of three fifths to form a quorum, it required, like other laws, that the question on its final passage should be taken by yeas and nays, and that they should be duly entered on the journals. It has never been the practice for the presiding officers to certify that these directions of the constitution were complied with. The presumption is that they were; and in my judgment it is not admissible to prove the contrary in any case, and certainly not where the pleadings have not tendered an issue on that fact.

But assuming that we may look beyond the act as published by authority, into the journals of the legislature, it will be seen that there is no foundation for the charge that the legislature failed to comply with the directions of the constitution. On looking into the senate journal of 1851, it appears that the bill in question originated in that body, and that on its final passage the yeas and nays were taken and entered in the journal, and were 21 to 2. (*Journal of the Senate of* 1851, *p.* 292, 293.) The assembly returned the bill to the senate with divers amendments. The senate had these amendments under consideration, and proposed certain amendments thereto, and then agreed to the amendments as amended by a vote of 23 to 1, the yeas and nays being taken and entered in the journal. (*Senate Journal,* 1851, *p.* 541.) The amendments thus amended were returned by the senate to the house. The latter body nonconcurred in the amendments of the senate, and a joint committee of conference was appointed, which recommended that the senate should recede from two of its amendments, and that the house should adopt the resi-

due. This was agreed to by the house by a unanimous vote, eighty-six voting by yeas and nays, which are entered in their journal. The senate receded from the two amendments as recommended by the joint committee, without a vote by yeas and nays and without entering the names of those voting in the journal. The omission to call the yeas and nays, on receding from these two amendments and recording the names of those voting, is the only fact objected to as a departure from the constitution.

I think the requirement of the constitution was fully satisfied by the senate on the final passage of the bill before it was sent to the house, and on the final passage of the amendments. The course and practice of the legislature did not require that the whole bill should be again read, on receding from the two amendments recommended to be abandoned by the joint committee of conference. There is nothing in the constitution which requires the yeas and nays to be taken in receding from an amendment which the senate had once adopted by the requisite vote and in the prescribed form. In point of fact, every part of the law as it stands, has received the requisite majority in both houses, the yeas and nays in both were taken on its final passage and entered on the journals. The law, therefore, was passed without violating any of the forms of the constitution.

Again; the provision of the constitution requiring the question upon the final passage of a bill to be taken immediately upon its last reading, and the yeas and nays to be entered on the journal is only directory to the legislature. There is no clause declaring the act to be void if this direction be not followed. It does not stand on the same footing with the requirement of a certain number to form a quorum, or to pass a bill. In the latter case there is a defect of power if the requisite number be not present and voting. The supreme court declared that a provision for recording the yeas and nays in the charter of a municipal corporation was directory and not imperative.

Although the act of May 12, 1847, p. 276, directs the presiding officers of each house, when a bill requires for its passage a quorum of three fifths of all the members elected to each house to be present on the final passage thereof, to certify to such fact, yet it makes the certificate only presumptive evidence of the fact contained in it. Hence, a bill certified to be passed when the requisite quorum was present, may be shown under proper pleadings, to have been passed, when three fifths were not present. On the same principle, if the proper officers have failed to give the certificate, the fact that three fifths were present when it was passed, may be shown from the journals or other evidence of an equally satisfactory character. The act of 1847 does not make the certificate or the want of one *conclusive,* but only *presumptive evidence.* On a reference to the journals of both houses it appears that in the present case, there was the quorum of three fifths present in each house on the final passage of the act. The act was thus passed in full compliance with the constitution, even if we admit that a quorum of three fifths was indispensable. It is not competent for the legislature to make the failure of its officers to append the proper certificate, defeat the provisions of the constitution Such would be the effect of the act if the want of a certificate was made *conclusive* evidence that three fifths were not present, when the final vote was taken. The constitution has clothed the legislature with no such power. And in the present instance, they have not arrogated to themselves any such power.

The objection that the law is not obligatory because it is in conflict with the laws of congress is equally untenable It has not been shown that in respect to that part of the law which the plaintiffs in error were required to administer, there is any incongruity between it and the laws of the United States. And I am not prepared to say that any part of it conflicts either with the constitution of the United States, or with any laws of the general government

SEL. IV.—42

The next objection raised by the plaintiffs in error is, that the board of supervisors had no power over the subject, except at their annual meeting, and as they omitted to do their duty then, it is contended they can not be compelled to do it at any other time, without the aid of a special act of the legislature. This position is untenable. The supervisors are required to meet annually in their respective counties for the despatch of business, and they may hold special meetings at such times and places as they may find convenient. (1 *R. S.* 366, § 1.) Their neglect to perform their *duty* at the time required can not nullify the statute. They or their successors are bound to do what was required and on failure to perform it, may be compelled by mandamus, and in some cases are liable to a penalty for their neglect. (*Caswell* v. *Allen*, 7 *J. R.* 63, 68; *The People* v. *The Supervisors of Columbia*, 10 *Wend.* 363; *The People* v. *Allen*, 6 *Wend.* 486; *People* v. *Steele*, 2 *Barbour*, 418; *The People* v. *Collins*, 19 *Wend.* 56.)

The omission of the plaintiffs in error to do their duty at the proper time, though it has thrown some embarrassment in the way, does not render a substantial compliance with the statute impossible. The supervisors, or the successors of those then in office, can be convened, and can issue their warrant for the commutation tax. The mandamus was a proper way to compel them to proceed, and I think that the judgment of the supreme court should be affirmed.

Judgment affirmed in each case.