[No. 717.]

THE STATE OF NEVADA EX REL. WESLEY GEORGE, RELATOR, *v.* S. T. SWIFT, RESPONDENT.

STATUTE AS ENROLLED CONCLUSIVE.—Where an act has been passed by the legislature, signed by the proper officers of each house, approved by the governor, and filed in the office of the secretary of state, it constitutes a record which is conclusive evidence of the passage of the act as enrolled.

EVIDENCE IMPEACHING AN ENROLLED STATUTE.—Neither the journals kept by the legislature, nor the bill as originally introduced, nor the amendments attached to it, nor parol evidence, can be received in order to show that an act of the legislature, properly enrolled, authenticated and deposited with the secretary of state, did not become a law.

EXISTENCE OF A LAW—HOW PROVED.—This Court, for the purpose of informing itself of the existence or terms of a law, cannot look beyond the enrolled act certified to by those officers who are charged by the Constitution with the duty of certifying and with the duty of deciding what laws have been enacted.

THIS was an application to the Supreme Court for a writ of mandamus to compel the respondent, S. T. Swift, as sheriff of Ormsby County, to issue to relator a license to conduct and keep the game of faro in Carson City for the term of three months.

The facts are stated in the opinion.

*Robert M. Clarke,* for Relator.

I. The act to amend " An act to restrict gaming, approved March 4, 1875," did not pass the legislature. The act which passed the legislature was not "presented to the governor," and the act which was approved by the governor did not pass the legislature, therefore the act never became a law. (Constitution of Nevada, Art. IV, Secs. 14, 17, 18, 35; *Jones* v. *Hutchinson,* 43 Ala. 721.)

II. The court may resort to the journals and to the engrossed bill, to ascertain whether the two houses, in fact, concurred in the passage of the act, and if from this source it is made to appear that the act did not pass the legislature, it will be held invalid and of no effect. (*Burr & Co.* v. *Ross et al.,* 19 Ark. 250; *Spangler* v. *Jacoby,* 14 Ill. 297; 17 Ill. 151; 19 Ill. 283; 43 Ill. 77; 62 Ill. 253; *State* v. *Platt,* 2 S. C. (N. S.) 150; *Fowler* v. *Pierce,* 2 Cal. 165; *Ramsey Co.* v. *Heenan,* 2 Minn. 330; *Southwark Bank* v. *Commonwealth,* 26 Penn. State, 446; *State* v. *McBride,* 4 Mo. 303; *Jones* v. *Hutchinson,* 43 Ala. 721; *People* v. *Chenango Co.,* 8 N. Y. 317; *Commonwealth* v. *Jackson,* 5 Bush. (Ky.) 680; *People* v. *Mahaney,* 13 Mich. 492; *Coleman* v. *Dobbins,* 8 Ind. 156; *Purdy* v. *People,* 4 Hill, 390; *De Bow* v. *The People,* 1 Denio, 11; *Judicial Opinion,* 35 N. H. 579; Cushing's Law and Prac., Secs. 425, 426, 427, 428; Cooley's Const. Limitations, 135; Sedgwick S. & C. Construction, 67, 68, 69; *Skinner* v. *Deming,* 2 Ind. 558; *McCullough* v. *Estall,* 11 Ind. 424.)

III. In this State it is the unquestioned law that those provisions of the Constitution which prescribe the manner of enacting laws are *mandatory* upon the legislature. The conclusion necessarily follows that the court can look beyond the enrolled bill, for since the enrolled bill cannot disclose the defect, there must be some other means by which the failure of the legislature to comply with the requirements of the Constitution can be made to appear.

*William Patterson,* for Respondent.

I. Mandamus will not lie in this case, as the relator has another specific, speedy and adequate remedy. It is immaterial to him whether he has the license or not; for if he should be prosecuted, he could plead the tender and demand for the license. A license cannot be sold or transferred.

II. Neither the journals of the legislature, nor the bill as originally introduced, nor the *amendments* attached to it, nor parol evidence, can be received in order to show that an act of the legislature properly enrolled, authenticated, and deposited with the secretary of state, did not become a law *with the prescribed forms*, or did not become a law *as enrolled*. (*Sherman* v. *Story,* 30 Cal. 253; *O. & V. R. R. Co.* v. *Plumas Co.,* 37 Cal. 363; *People* v. *Burt,* 43 Cal. 560; *Pangburn et al.* v. *Young,* 32 N. J. 29.)

*T. W. W. Davies,* also for Respondent.

I. The enrolled bill is a monument of so high a nature, and imports in itself such absolute verity, that it must be tried only by itself, *teste meipso ;* and it is not competent to impeach the verity of an·act, properly authenticated, by parol testimony or documentary evidence. By what authority can this court assume to disregard the authentication provided by the legislature, and instead substitute a mode of inquiry of its own? To give the executive and judicial departments the power to re-revise the exercise of their judgment, would be subjecting the legislature to a surveillance which, instead of making it a co-ordinate department, would subject it to a dependence on the others.

There is a fitness in making each department the sole judge of the rules prescribed for its conduct; this is necessary to render them co-ordinate, and not dependent on each other. The act in question being authenticated in the mode prescribed, we submit that it is not competent for this court to institute inquiry into the truth of the fact thus solemnly attested.

For a thorough and exhaustive discussion of this question the attention of the court is invited to the following cases, embracing critical reviews of the decisions relied on by the relator: *Pangburn et al.* v. *Young*, 32 N. J. 29; *Pacific Railroad* v. *The Governor*, 23 Mo. 353; *Sherman* v. *Story*, 30 Cal. 253; *O. & V. R. R. Co.* v. *Plumas Co.*, 37 Cal. 363; *People* v. *Burt*, 43 Cal. 560; *Fowke* v. *Fleming*, 13 Maryland, 412; *Duncombe* v. *Prindle*, 12 Iowa, 1; *People* v. *Purdy*, 2 Hill (N. Y.) 31; *People* v. *Purdy*, 4 Hill (S. C.) 384; *Eld.* v. *Graham*, 20 Conn. 16; 1 Greenleaf on Ev., Sec. 480; *Warner* v. *Commonwealth*, 2 Virginia Cases, 95.) When we once depart from the sound rule of law of regarding the enrolled bill as conclusive, as a high record importing absolute verity, and to be proved only by itself, we shall be involved in endless frauds, doubts, mischiefs and absurdities.

By the Court, BEATTY, J.:

The respondent is sheriff of Ormsby County. As such sheriff it is his duty, upon proper demand and tender of the amount prescribed by statute, to issue licenses authorizing the holders to conduct certain banking games, including the game of faro. The relator, a citizen of Ormsby County, made a proper demand upon the respondent for a quarterly license to conduct a game of faro in Carson City, in said county, and at the same time tendered in payment therefor the sum of two hundred and three dollars and fifty cents in gold coin. The amount thus tendered was sufficient to entitle the relator to the issuance of the license, as demanded, provided section 4 of the gaming act of 1869 (2 Compiled Laws, 3292) is still in force. But among the regularly certified enrolled and published acts of the last legislature is one entitled "An act to amend 'An act to restrict gaming,' passed March fourth, eighteen hundred and sixty-nine, and all acts amendatory thereof." By the second section of this act, section 4 of the act of 1869 is so amended as to require payment of four hundred dollars for a quarterly gaming license.

Assuming the validity of this enactment, the respondent

refused to issue the license for the amount tendered, and the relator, denying its validity, asks us to compel him by mandamus to do so. It is not pretended that any provision of the act is unconstitutional in its terms, but we are told that an inspection of the legislative journals and other documents will show that this section two of the amendatory bill, as enrolled, was never passed by the legislature; that it was adopted as an amendment in the senate to the bill as originally passed in the assembly; that the assembly refused to concur in the amendment, and the senate thereupon receded, and concurred in the bill as originally passed in the assembly; that nevertheless this amendment, which was finally rejected by both houses, and never assented to by one of them, was engrossed in the bill which was signed by the officers of the two houses, presented to the governor for his approval, approved and signed by him, and deposited in the office of the secretary of state, where it now appears as part of the statute-roll.

If this Court, for the purpose of informing itself of the existence of a public statute, or testing its validity, is at liberty to look beyond the statute-roll, solemnly attested in accordance with the provisions of the Constitution, and is bound to give controlling force to the entries in the legislative journals, then, in this case, it does clearly appear from an examination of those journals that assembly bill No. 138, entitled as this act is entitled, was finally passed in the terms in which it was introduced, after the rejection of an amendment proposed and originally adopted in the senate. But as the journals do not purport to contain the language or even the substance of either the bill or the amendment—only referring to it by its number and title—they cannot, by themselves, as a matter of course, impeach the enrolled act, for the two are easily and completely reconciled by supposing that the bill was originally drawn in the terms of the enrolled act. We are accordingly asked by the relator to go a step further, and look at a paper now in the office of the secretary of state, purporting to be the original bill as introduced into the assembly—

the bill, it is said, to which the journals refer, and which, by a comparison with the journals and statute-roll, shows that section two, as approved by the governor, and enrolled, was never passed by the legislature. If we are at liberty to institute this examination and comparison, and if credit is to be given to the journals and this loose paper in preference to the statute-roll, then the conclusion of relator seems to follow. We have no doubt, as matter of fact, that the paper referred to is the original of assembly bill No. 138. It is so indorsed; it has the same title; on the back are memoranda signed by the assistant secretary of the senate and the assistant clerk of the assembly, showing the action upon it of the two houses, and these memoranda correspond with the entries in the journals in date, as in other particulars. It is found among the archives of the last assembly deposited in the office of the secretary of state, where the law requires the clerk of the assembly, at the close of each session, to deposit all such papers, properly arranged and labeled. (Stat. 1873, p. 155, Sec. 5.)

Such being the marks of its identity, we are satisfied that it is what it purports to be—the original bill for the act in question. Its contents, except in the second section, are the same as those of the enrolled statute. That section, as originally drawn, is crossed out by pencil-marks, and over it is pasted to the margin of the paper a tag, on which is written, "Strike out section two and insert the following." Then follows section two of the enrolled act, which differs materially from the original section, not only in respect to the amount to be paid for a quarterly gaming license, but in other particulars. On the margin of the tag these words appear in pencil: "Adopted in senate." This seems pretty clearly to identify the contents of the tag or rider, and of section two of the enrolled bill with the rejected senate amendment; and it follows, therefore, on the assumption that these matters, extraneous to the statute-roll, must be noticed, that the bill passed by the legislature was never approved by the governor, and that the bill approved by the governor was never passed by the legislature; and, conse-

quently, that the amendatory act is void; the old act remains in force; relator's tender was sufficient, and the mandamus ought to issue.

It results, therefore, that the question of law directly presented for our decision, relates solely to a rule of evidence. How is a court to be satisfied as to the existence and terms of a statute? Is it bound by the statute-roll, or can it look beyond that record? And if so, how far can the investigation be extended? The importance of these questions in their general bearing cannot easily be over-estimated. The determination of this particular case may affect very slightly the public revenues or the public morality, but it is a matter of very great moment to every citizen of the State, that on the first presentation of the question here, this court should lay down a correct and safe rule by which he may determine what that law is which is to bind him in all his transactions, giving its construction to his agreements, limiting the measure of his rights, and his mode of redress where his rights are invaded. For whoever engages in any transaction the validity or construction of which depends upon statutory provisions, whoever holds or acquires any sort of property, or right, the title or enjoyment of which may be affected by the operation of any law, is bound to take notice, at his peril, what the law is. And it is not enough for him to know what the law is after a court of last resort has made an investigation and determined what part of the statute-roll is to stand and what part to fall, but he must know in advance of litigation, and govern his conduct accordingly. If there is any record or document outside of the statute-roll to which a court will resort for the purpose of testing the validity of an enrolled law, he must not overlook it. If a court will hear oral testimony to impeach the record, he must be able to conjecture in advance what the testimony will be, and what weight will be allowed to it. Considering the exigency of this rule it is easy to perceive of what extreme importance it is that there should be some high, authentic and unquestionable record to which not only courts and

public officers, but private citizens, may resort, and by a simple inspection determine for themselves with infallible certainty what are the statutes of the State, and what are their terms.   Considerations such as these had led to the firm establishment in England, at a date anterior to American independence, of the maxims that matters of public law are not the subject of allegation or denial in pleading, nor of proof upon the trial of causes; but that courts would always take judicial notice of the law, and that, upon the suggestion of any doubt as to the existence or provisions of a parliamentary enactment, the court would inform itself in the best way it could, not by listening to proofs, but by inspection of the record, if it was in existence, and if not, by looking to the printed statute, or, failing that, by examination of other documents where it had been recited, recognized and acted upon.   The record, which, as long as it existed, was held to import absolute verity, which not only dispensed with, but excluded all other evidence which could neither be aided nor impeached by the journals of parliament, was the copy of the act enrolled by the clerk of the parliament and delivered over into chancery. The question frequently arose in England, but the rule was uniformly maintained that the courts would look to the statute-roll, and to that alone.   The English authorities upon this point are thoroughly reviewed, and their result clearly and ably stated in the cases of *Sherman* v. *Story* (30 Cal. 256), and *Pangburn* v. *Young* (32 N. J. 41).   The rule they establish was part of the common law long before the question here presented ever arose in this country.   If applicable to our condition and not abrogated by constitutional or statutory provisions, it was, and is, binding upon the courts of every State that has adopted the common law as the rule of decision.   Moreover, being founded upon the gravest considerations of public policy, and expressing the wisdom derived from centuries of experience, it would seem that such a rule should not be lightly departed from. Nevertheless, it will appear that there is a serious conflict of authority in this country as to whether the ancient rule

should be upheld or not. A review of the decisions, however, I think will show that the weight of authority is in its favor. The question appears to have been decided in fifteen States. In nine States, viz., Connecticut, New York, New Jersey, Maryland, Missouri, Iowa, North Carolina, Indiana and California, the old rule is upheld. In six States, viz., Alabama, Arkansas, Illinois, South Carolina, Minnesota and New Hampshire, it is repudiated. In Michigan there are *dicta* in favor of the new departure. In Ohio and Kentucky the question has been noticed, but its decision waived. In Mississippi the court divided on the question. A more particular examination of the cases will show that in every instance where the question seems to have been thoroughly considered, after a conscientious examination of the authorities, the decision has been in favor of the old rule. This remark is especially applicable to the opinions delivered in the most recent cases involving the question in California, New Jersey, Indiana, and Missouri. Where, on the contrary, the decisions or *dicta* of courts have been in favor of the innovation contended for, it will be found that they have either ignored all precedent, or, as is more frequently the case, that they assume to sustain their position by reference to authorities which turn out on examination to be adverse, or to have been overruled. To vindicate the soundness of this criticism, a short review of the cases in which the new doctrine has been countenanced or upheld, will be necessary. To the others, with one or two exceptions, only a general reference will be made. Before entering upon this discussion, however, it will be convenient to notice those provisions of our Constitution which have an especial bearing upon the question at issue—provisions similar to those which in some other States have been held to warrant a departure from the old rule: "Each house shall keep a journal of its own proceedings, which shall be published, and the yeas and nays of the members of either house, on any question, shall, at the desire of any three members present, be entered on the journal." (Constitution, Art. IV, Sec. 14.)

"Every bill shall be read by sections on three several days in each house, unless, in case of emergency, two-thirds of the house where such bill may be pending shall deem it expedient to dispense with this rule; but the reading of a bill by sections on its final passage shall in no case be dispensed with, and the vote on the final passage of every bill or joint resolution shall be taken by yeas and nays, to be entered on the journals of each house; and a majority of all the members elected to each house shall be necessary to pass every bill or joint resolution, and all bills or joint resolutions so passed shall be signed by the presiding officers of the respective houses, and by the secretary of the senate and clerk of the assembly." (Art. IV, Sec. 18.)

In obedience to these provisions of the Constitution, each house of the legislature keeps a journal, which is authenticated by the signature, to the minutes of each day's proceedings, of the president and secretary in the senate, and the speaker and clerk in the assembly. These minutes, except those of the last day's proceedings of each session, are usually read over in the presence of the respective houses, and an opportunity given of correcting them before they are signed. Their correctness has, therefore, the implied sanction of the entire body of each house. But, in point of fact, they are often read and signed in the absence of many members whose votes they record; and the minutes of the last day's proceedings, which are never corrected for want of opportunity, often relate to the final passage of the most important and essential bills—such, for instance, as the appropriation bills. Obviously, then, the journals have no greater intrinsic value as evidence than the enrolled bill, which, in compliance with the above-quoted provision of the Constitution, is signed and attested by the very same officers who sign the journals.

These provisions of our Constitution and the practice thereunder, it will be observed, are substantially identical with those of other States whose decisions are to be noticed. The following authorities are referred to:  In New York:

*Thomas* v. *Dakin,* 22 Wend. 9; *Warner* v. *Beers,* 23 Wend.
103; *Purdy* v. *People,* 2 Hill, 31, and 4 Hill, 384; *De Bow*
v. *People,* 1 Denio, 9; *Com. Bank of Buffalo* v. *Sparrow,* 2
Denio, 97; *People* v. *Supervisors, etc.,* 8 N. Y. 317; *People*
v. *Devlin,* 33 N. Y. 269. In California: *Sherman* v. *Story,*
30 Cal. 256. In Missouri: *Pacific R. R.* v. *Governor,* 23
Mo. 353. In New Jersey: *Pangburn* v. *Young,* 32 N. J. 29.
In North Carolina: *Brodnax* v. *Groom,* 64 N. C. 244. In
·Maryland: *Fowke* v. *Fleming,* 13 Md. 412. In Indiana:
·*Evans* v. *Browne,* 30 Ind. 514. In Iowa: *Duncombe* v. *Prin-
dle,* 12 Iowa, 1. In Connecticut: *Eld* v. *Graham,* 20 Conn.
16. All these cases support the old rule, and no more par-
ticular reference to the decisions would be necessary ex-
cept for the singular fact that the earlier New York cases
have usually been relied upon as supporting the new doc-
·trine. An examination of the cases, however, will show that
they do nothing of the kind. By the constitution of New
York a two-thirds majority of each house of the legislature
was required to pass certain classes of bills, and a law of the
State provided that no act should be deemed to have passed
by a two-thirds majority unless it was so certified by the
presiding officer of each house. Another law made the
printed statutes certified by the secretary of state evidence
as to what the statutes were. Certain laws were printed in
the statute-book which it was claimed were of the class re-
quiring a two-thirds majority for their enactment, and no cer-
tificate that they had been so passed was printed with them.
The question that arose was whether the court could go be-
hind the printed statute-book and look at the enrolled bill
to see if it was certified as having passed by the requisite
majority. And it was held that they could look at the en-
rolled bill, and they did so, and found that it had not so
passed. But there was no question about going behind
the enrolled bill and impeaching it by reference to the
journals or anything else. It is true one or two senators in
the Court of Errors let fall some loose *dicta* about looking to
the journals, and Chief Justice Bronson afterwards (*De Bow*
v. *People,* 1 Denio, 14) fell into the error (speaking of the

decision in *Purdy* v. *People*, 4 Hill, 384) of saying, "And it seems that the journals kept by the two houses may also be consulted." This *dictum* of Judge Bronson, founded upon a *dictum*, seems to have led the courts of several other States to believe that the question had been so decided in New York. But in truth it never has been so decided there, and in the latest New York cases that have fallen under our observation, where the point was raised, it was expressly decided otherwise. Speaking of the directions of the constitution as to the passage of laws the court says: "It has never been the practice for the presiding officers to certify that these directions of the constitution were complied with. The presumption is that they were; and in my judgment it is not admissible to prove the contrary in any case, and certainly not where the pleadings have not tendered an issue upon that fact." (8 N. Y. 327.) In *People* v. *Devlin* (33 N. Y. 269) the question is thoroughly investigated and the authorities reviewed. The conclusion of the court is, that they cannot look beyond the enrolled bill. This case, together with those cases cited from 23 Mo., 30 Ind., 30 Cal. and 32 N. J., deserve particular attention. All are recent cases, and the opinions delivered evince unusual research and marked ability. The same may be said of the opinion of Mr. Justice Handy, of Mississippi (*Green* v. *Weller*, 32 Miss. 685). But in that case the Chief Justice dissented on the question under consideration, and the other associate justice expressed no opinion. From among these opinions we select that of the New Jersey court for extended quotation, for the reason that our Constitution is the same as that of New Jersey in every particular affecting this question, and because the whole argument is there very forcibly and fully set forth.

After describing the enrolled bills in language strictly applicable to those of this State, and reciting the provisions of the constitution as to the keeping and publishing of journals and the mode of passing bills, the court proceeds to say: "These are all the constitutional requirements relating to these diaries, and it will be observed, that with the ex-

ception of recording the yeas and nays on certain occasions, there is no prescription in the constitution of what they shall contain. They are not required to be attested in any way whatever; nor is it said that they shall even be read over to the house, so that their correctness may stand approved.

"From this comparison, it seems to me impossible for the mind not to incline to the opinion that the framers of the constitution, in exacting the keeping of these journals, did not design to create records which were to be paramount to all other evidence with regard to the enactment and contents of laws. At the time of the formation of the constitution, the mode of authenticating statutes by copy enrolled in the office of the secretary of state was completely established by common usage and by the sanction of its antiquity; and it was also obvious that a copy of an act thus enrolled was, in every essential particular, almost identical with a roll of parliament, which it was well known was not only admissible in evidence, but was conclusive as to the existence and provisions of the law which it embodied. Possessed of this knowledge, it is difficult to believe that the eminent jurists who, as delegates, helped to frame the constitution of 1844, meant to substitute a journal which was devoid of all the ordinary marks of authenticity, considered as a means of proof in a court of law, for a record which, in point of evidential efficacy, had no superior. If intended as evidence for any purpose whatever in any course of judicial investigation, can any one conceive that these registers would have been left in the condition in which by the constitution we find them? In the nature of things they must be constructed out of loose and hasty memoranda, made in the pressure of business and amid the distractions of a numerous assembly. There is required not a single guarantee of their accuracy or their truth; no one need vouch for them, and it is not enjoined that they should be either approved, copied or recorded. It must be admitted, I think, from these considerations, that a strong presumption arises that it was not the purpose of those who framed the consti-

tution, in enjoining each house to keep a journal, to establish such journals as the ultimate and conclusive evidence of the conformity of legislative action to the constitutional provisions in the enactment of laws.

"But independent of this question of intention as exhibited in our primary law, the more general inquiry arises, can the court resort to this source of information to satisfy itself on the point whether a legislative act has been thus constitutionally passed? The first consideration which naturally suggests itself in this connection is, that the legislature has, with care and a wise precaution, adopted a mode of certifying its own acts in an authentic form. And, indeed, so completely has this purpose been effected, that it appears hardly practicable to suggest additional safeguards. To the correctness of the present bill, for example, we have the signature of the presiding officer of each house. In its present form it was exhibited to the governor as the bill which had been enacted, and as such received his approval, as is evidenced by his signature. It was then immediately made public by being filed in the office of the secretary of state. These are the sanctions which the legislature has provided for the authentication of its own acts, both to the public and to the judicial tribunals; and the question is therefore presented whether such authentication must not be deemed conclusive; or, in other words, whether the legislature does not possess the right of declaring what shall be the supreme evidence of the authenticity of its own statutes." [The case is stronger in Nevada, for here the constitution itself prescribes the mode of authenticating the statutes, and provides not only that they shall be signed by the presiding officers of the two houses of the legislature, but also by the secretary of the senate and the clerk of the assembly (Art. IV, Sec. 18).]

"This question, in my opinion, must be answered in the affirmative. How can it be otherwise? The body that passes a law must of necessity promulgate it in some form. In point of fact, the legislative authority over the certification of its own laws is, of necessity, almost unlimited, as

will appear from the circumstance that with regard to the body of an act, there is no evidence of any kind but that which the legislature itself furnishes in the copy deposited in the State archives. The journals do not purport to contain more than the amendments, so that the legislative control is absolute with regard to the essential parts of the laws which are enacted. We are also to reflect that it is the power which passes the law which can best determine what the law is which itself has created. The legislature in this case has certified to this court, by the hands of its two principal officers, that the act now before us is the identical statute which it approved; and, in my opinion, it is not competent for this court to institute an inquiry into the truth of the fact thus solemnly attested. Nor do I think this result is to be deprecated. I think the rule thus adopted accords with public policy. Indeed, in my estimation, few things would be more mischievous than the introduction of the opposite rule. A little reflection will satisfy most persons of the truth of this remark. Let us examine the proposition, in a few words. The rule contended for is that the court should look at the journals of the legislature to ascertain whether the copy of the act attested and filed with the secretary of state conforms in its contents with the statements of such journals. This proposition means, if it has any legal value whatever, that in the event of a material discrepancy between the journal and the enrolled copy, the former is to be taken as the standard of veracity, and the act is to be rejected. This is the test which is to be applied, not only to the statute now before the court, but to all statutes; not only to laws which have been recently passed, but to laws the most ancient. To my mind, nothing can be more certain than that the acceptance of this doctrine by the court would unsettle the entire statute law of the State."

The court then proceeds to remark how incomplete, and how much exposed to the chances of inaccuracy and mistake,.the journals are and must always be. After which it continues :

" Can any one deny that if the laws of the State are to be tested by a comparison with these journals, so imperfect, so unauthenticated, that the stability of all written law will be shaken to its foundations? Certainly no person can venture to say that many of our statutes, perhaps some of the oldest and most important, those which affect large classes of persons, or on which great interests depend, will not be found defective, even in constitutional particulars, if judged by this criterion. The misplacing of a name, on a nicely-balanced vote, might obviously invalidate any act. What assurance is there, therefore, that a critical examination of these loosely kept registers will not reveal many fatal errors of this description? In addition to these considerations in judging of consequences, we are to remember the danger, under the prevalence of such a doctrine, to be apprehended from the intentional corruption of evidence of this character. It is scarcely too much to say that the legal existence of almost every legislative act would be at the mercy of all persons having access to these journals, for it is obvious that any law can be invalidated by the interpolation of a few lines, or the obliteration of one name and the substitution of another in its stead. I cannot consent to expose the State legislation to the hazards of such probable error or facile fraud.

"The principal argument in favor of this judicial appeal from the enrolled law to the legislative journal, and which was much pressed in the discussion at the bar, was that the existence of this power was necessary to keep the legislature from overstepping the bounds of the constitution. The course of reasoning urged was that if the court cannot look at the facts and examine the legislative action, that department of government can, at will, set at defiance, in the enactment of statutes, the restraints of the organic law. This argument, however specious, is not solid. The power thus claimed for the judiciary would be entirely inefficacious, as a controlling force, over any intentional exorbitance of the lawmaking branch of the government. If we may be permitted, for the purpose of illustration, to suppose the legis-

lature to design the enactment of a law in violation of the principles of the constitution, a judicial authority to inspect the journals of that body would interpose not the slightest barrier against such transgression; for it is obvious that there could not be the least difficulty in withholding from such journals every fact evincive of such transgression.   A journal can be no check on the actions of those who keep it, when a violation of duty is intentional. It cannot, therefore, fail to be observed how inadequate to the correction of the supposed evil is the proposed remedy. Besides, if the journal is to be consulted, on the ground of the necessity of judicial intervention, how is it that the inquiry is to stop at that point?  In law, upon ordinary rules, it is plain that a journal is not a record, and is, therefore, open to be explained or contradicted by parol proof.   And yet, is it not evident that the court could not, upon the plainest grounds, enter upon such an investigation?  In the case now in hand, if the offer should be made to prove by the testimony of every member of the legislature that the journals laid before us are false, and that, as a matter of fact, the enrolled law did receive, in its present form, the sanction of both houses, no person versed in jurisprudence, it is presumed, would maintain that such evidence would be competent.   The court cannot try issues of fact; nor, with any propriety, could the existence of statutes be made dependent on the result of such investigations.  With regard to matters of fact, no judicial unity of opinion could be expected, and the consequence would necessarily be that the conclusion of different courts, as to the legal existence of laws from the same proofs, would be often variant, and the same tribunal which to-day declared a statute void, might to-morrow be compelled, under the effect of additional evidence, to·pronounce in its favor.   The notion that courts could listen upon this subject to parol proof is totally inadmissible, and it therefore unavoidably results that, if the journal is to be taken into consideration at all, its effect is uncontrollable; neither its frauds can be exposed, nor its errors corrected.   And if this be so, and the journal is to

limit the inquiry of the judicial power, how obvious the inadequacy, if not futility, of such inquiry? In my estimation, the doctrine in question, if entertained, would, as against legislative encroachments, be useless as a guard to the constitution, and it certainly would be attended by many evils. Its practical application would be full of embarrassment. If the courts, in order to test the validity of a statute, are to draw the comparison between the enrolled copy of an act and the entries on the legislative journal, how great, to have the effect of exploding the act, must be the discrepancy between the two? Will the omission of any provision, no matter how unimportant, have that effect? The difficulty of a satisfactory answer to these and similar interrogatories is too apparent to need comment. And again, to notice one among the many practical difficulties which suggest themselves, what is to be the extent of the application of this doctrine? If an enrolled statute of this State does not carry within itself conclusive evidence of its own authenticity, it would seem that the same principle must be extended to the statutes, however authenticated, of other States. An act, therefore, of Virginia or California, with regard to the mode of its enactment, would be open to trial as a matter *in pais*. And indeed, the doctrine, if carried to its legitimate conclusion, would seem to abolish altogether the conclusiveness even of international authentications, for if the great seal of this State, attesting the existence of a statute, is not final, it is not perceived how a greater efficacy is to be given to the seal of a foreign government.

"In addition to the foregoing observations, I cannot close this part of my examination of the question under discussion without adverting to a further consideration, which to my mind appears to be entitled to very great, if not decisive weight. I here allude to the circumstance that, in the structure of the government of this State, the judicial and legislative departments are made coequal, and that it nowhere appears that the one has the right of supervision over the other. It is true, as was much pressed on the argument, that the legislative branch may willfully infringe

constitutional prescriptions. But the capacity to abuse power is a defect inherent in every scheme of human government, and yet, nevertheless, the forces of government must be reposed in some hands. The prerogatives to make, to execute and to expound the laws must reside somewhere. Depositaries of those great national trusts must be found, though it is certain such depositaries may betray the trust thus reposed in them. In the frame of our State government the recipients and organs of this threefold power are the legislature, the executive and judiciary, and they are co-ordinate — in all things equal and independent; each within its sphere is the trusted agent of the public. With what propriety, then, is it claimed that the judicial branch can erect itself into the custodian of the good faith of the legislative department? It is to be borne in mind that the point now touched does not relate to the capacity to pronounce a law, which is admitted to have been enacted, void, by reason of its unconstitutionality. That is clearly a function of judicature. But the proposition is, whether, when the legislature has certified to a mere matter of fact, relating to its own conduct and within its own cognizance, the courts of the State are at liberty to inquire into or dispute the veracity of that certificate. I can discover nothing in the constitution, or in the general principles of government, which will justify the assumption of such superior authority. In my opinion the power to certify to the public the laws which itself has enacted, is one of the trusts of the constitution to the legislature of the State."

This able opinion of the Chief Justice of New Jersey is reinforced by a concurring opinion of one of the associate justices, in which the argument is further illustrated and enforced. It is sustained by the amplest citation of authorities, and by the conclusions independently reached upon the same line of argument, by the Supreme Courts of California, New York, Indiana and Wisconsin. It fails to notice only one consideration urged upon the hearing of this case, and that is, that besides the necessity of looking to the journals for the purpose of restraining the legislature

from intentional violation of the Constitution in the passage of laws, it is necessary to do so in order to correct the mistakes of the officers in certifying its acts.   The answer to this is that the journals are as likely, at least, to contain mistakes as the enrolled laws, and if they did in one instance afford the means of correcting a mistake of enrollment, they might in another instance, by their own inaccuracy, destroy a law of the utmost importance that was actually passed.   Practically, it cannot be considered any greater evil that the people of Nevada should be subject for two years to the operation of a law, one clause of which was not concurred in by the Assembly, than that they should be deprived of the advantages of some other law, actually passed, but which an inaccuracy of the journal might impeach.   The hope of doing good by the course suggested is more than overbalanced by the danger of doing harm, and, therefore, presents no equivalent for the incalculable disadvantage of reducing the statute law from a state of certainty to one of everlasting doubt.   We say *everlasting*, because there is no direct proceeding in which the validity of a statute can be once tested and set at rest. The question could only arise collaterally in a controversy between individuals, and its determination would not render it *res judicata* in any other controversy, even between the same parties.   It would have to be tried over and over again, and no man ever would know whether there was a law or no law until his case had been determined.   We are not prepared, for the sake of such results, and without the prospect of any substantial gain, to overthrow an old and firmly established rule of evidence—a rule which has indeed been questioned, but we think not invalidated by the following decisions, which we notice for the purpose of pointing out the reasons why, in our estimation, they are entitled to but little weight.

The leading case in favor of the new departure is that of *Spangler* v. *Jacoby* (14 Ill. 297), and it is especially deserving of our attention because it gave a construction to provisions of the Illinois Constitution substantially identical

with the provisions of our own Constitution before its adoption; from which it might be held that along with the provisions we had adopted the construction previously given to them. But this argument is weakened by the fact that the same or similar provisions are contained in most of the State constitutions, and they cannot be supposed to have been borrowed especially from Illinois.

The Constitution of Illinois, like our own, provides that "each house shall keep a journal of its proceedings;" that "on the final passage of all bills the vote shall be by ayes and noes, and shall be entered on the journal; and no bill shall become a law without the concurrence of a majority of all the members elect in each house."

From these provisions it is concluded that the journals, being required to be kept by the Constitution, and to show affirmatively a majority vote in favor of the final passage of every bill, are records of as high authority at least as the enrolled bill, and that where they fail to show a majority voting for the bill on its final passage in either house, the act falls to the ground. The utmost extent to which this decision goes, however, is, that the journals may be looked to to see if they contain the evidence which the Constitution requires they should contain of the final passage of the bill; and they may be looked to because they are records. It is not hinted that the court may look beyond the record. The decision is based partly upon reasons drawn from the nature of the constitutional provisions, and partly upon the assumption that it is supported by authority.. As to the constitutional reasons, they have been noticed in another connection. As to the authorities it is to be observed that the English authorities are not alluded to. The American authorities cited are: *State* v. *McBride,* 4 Missouri, 303; *Green* v. *Graves,* 1 Doug. (Michigan) 351; *Purdy* v. *People,* 2 Hill, 31, and 4 Hill, 384. Of these three cases the Missouri case alone even seems to sustain the doctrine in support of which it is cited; and if it ever did sustain it, it has been overruled by a more recent case in the same State (*Pacific R. R.* v. *Governor,* 23 Mo. 353). But in truth it

never bore the construction placed upon it, as is clearly pointed out in the later case referred to.

The only point decided in the Michigan case is, that the legislature had no power under the Constitution to pass a general incorporation law. The Constitution required that every act of incorporation should receive a two-thirds vote. It was held that this required every corporation to be created by special act.

Replying to an argument that an amendment to this general act, so held unconstitutional by recognizing existing associations formed under its provisions, might be regarded as specially creating corporations out of the associations so recognized, one of the judges expressed the *dictum*, not concurred in by the others, that the amendment could not be held to operate as a special creation, because, under his own construction of the Constitution and the practice of the legislature, the amendment might have been passed by a bare majority. It was not suggested that the court could inform itself by looking at the journals.

The New York case referred to, like all the other cases decided in the same State, not only does not sustain the Illinois court, but all its implications are to the contrary.

Later decisions in Illinois follow *Spangler* v. *Jacoby* with some dissent, or at least with some reservation of opinion on the part of individual judges. (17 Ill. 151.) It should be noted also, that the case of *Spangler* v. *Jacoby* lacks the sanction of Judge Trumbull's concurrence. (See note prefixed to the volume in which it is reported. See also 19 Ill. 283; 43 Id. 97; 62 Id. 253.) In Minnesota the doctrine of the Illinois cases is carried a long step forward. There it is held (*Supervisors* v. *Keenan*, 2 Minn. 331) that a court will examine the legislative journals to see if a bill has been read three times before its final passage. The opinion in this case also totally ignores the English authorities, but cites a long list of New York cases, not one of which lends the slightest countenance to the doctrine asserted; and this illustrates its value as an authority.

In Alabama (*Jones* v. *Hutchinson*, 43 Ala. 721) the point

is decided in accordance with the doctrine of *Spangler* v. *Jacoby,* and it is decided solely on the authority of the Illinois cases which do sustain it, the New York cases which do not sustain it, and the case of *Fowler* v. *Pierce* (2 Cal. Reps.), which had already been overruled by the able and elaborate opinion in *Sherman* v. *Story* (30 Cal. 270). This total ignoring of the older authorities and reliance upon adverse and overruled cases, greatly impairs any authority the Alabama decision might have had.

In Arkansas (*Burr & Co.* v. *Ross & Leitch,* 19 Ark. 250) a public statute was set aside on the evidence furnished by the journal of the assembly that in that house the bill had been indefinitely postponed. This was done without any discussion of the question involved and upon the sole authority of the much-abused New York cases, which are here again made to do unwilling duty on the wrong side.

In South Carolina (*State* v. *Peatt,* 2 S. C., new series, 150) a majority of the Supreme Court hold that a court will not only correct an enrolled act by comparison with the legislative journals, but that it will look beyond the journals to the original bill, and they hold also that they can set aside part of the law and uphold the balance. In this and other respects they go entirely beyond all precedent. They in fact ignore all precedent and attempt to sustain themselves by arguments drawn from the nature of courts and constitutions in general, an attempt in which they seem to me to have signally failed, as is clearly shown in the able dissenting opinion delivered by the Chief Justice, in which the authorities are carefully reviewed.

In New Hampshire the judges of the Supreme Court have twice unanimously held, in official opinions delivered in response to inquiries from the governor and council, that enrolled acts of that State were invalid because the journal of one house did not show a concurrence in amendments adopted in the other. The authorities are not referred to in the opinions, but are collected in a note by the reporter, and seem to have been consulted; so that in one particular these decisions are entitled to more respect than most of those on that side. (35 N. H. 579; 52 Id. 622.)

In Indiana for a long time the Supreme Court, in *dicta* rather than decisions, indorsed the doctrine of the Illinois cases. (See *Skinner* v. *Deming*, 2 Ind. 558; *Coleman* v. *Dobbins*, 8 Ind. 156; *McCullough* v. *State*, 11 Ind. 424.)

But all these decisions, if they are decisions, are over-ruled by the late case above referred to, which exposes the absurdities into which the court has been led in following out the new doctrine.

In Michigan the Supreme Court was asked to declare a law inoperative, because, as was alleged, some of the members of the majority in the legislature by which the bill had been passed had not been legally elected. In other words, the court was asked to reinvestigate in this collateral proceeding the title of the members of the legislature to their seats. Of course the court held that upon that matter the action of the legislature was conclusive, and sustained the law. But without any occasion to do so, Judge Cooley, who delivered the opinion, went out of his way to say that a printed statute is not even of *prima facie* validity when the journals show that some constitutional formality was wanting to its passage. And he, too, cites a list of the New York cases in support of this *dictum*. (13 Mich. 481.) Judge Cooley, as a text-writer, also lays down the same doctrine, and sustains the text by a similarly unfortunate citation of authorities. (Cooley's Constitutional Limitations, 135.)

From this review it appears that the doctrine contended for has been upheld by decisions in six States and by *dicta* in one. But it also appears that most of the decisions are of slight authority.

But even if we admitted the correctness of the decision in *Spangler* v. *Jacoby*, upon the constitutional grounds upon which it is placed, it would not help the relator in this case, for it is there only held that the journals can be resorted to because for certain purposes they are made by the Constitution a record of as much sanctity as the enrolled laws. Here a reference to the journals alone shows no discrepancy between the enrolled act and the act passed. To discover the

alleged discrepancy we must look further to a loose paper possessing no characteristic of a record. Our right to pursue the investigation to that extent is sustained by the South Carolina court alone, and that with a divided bench.

The Kentucky case to which we are referred (5 Bush. 680) notices the question, but does not decide it.

The decision of Judge Thurman (3 Ohio State, 484), cited by Judge Cooley, expressly waives the question; but so far as it is noticed, the argument is all against the doctrine which it is supposed to sustain.

As a set-off to Judge Cooley's text, we would refer to a vigorous opinion of Attorney-General Black, quoted in a note to *Coleman* v. *Dobbins*, 8 Ind. 156.

From this discussion it appears that the decided weight of authority, as well as every consideration of expediency, is opposed to the doctrine that this, or any court, for the purpose of informing itself of the existence or terms of a law, can look beyond the enrolled act certified by those officers who are charged by the Constitution with the duty of certifying, and therefore, of course, with the duty of deciding what laws have been enacted.

Mandamus denied.