COMM'RS OF LEAVENWORTH CO. v. JOHN HIGGINBOTHAM.

1. COUNTY INDEBTEDNESS—*Not Discharged by mere Levy of Tax.* The mere levying and collecting a tax with which to pay certain county indebtedness, does not relieve the county from paying such indebtedness.

2. ———— *When Action not Barred.* Where a county owes a debt in writing, which has been due for more than five years, but the county has paid the interest on such debt up to within less than five years, and has otherwise, within that time, in writing and repeatedly, acknowledged its own liability to pay such debt, *held,* that the five-years statute of limitation has not barred an action for the recovery of such debt.

3. STATUTES, *Not to be Lightly Impeached.* Where an act of the legislature was passed and published more than eleven years ago, and since that time all the departments of the state government have held it to be valid, and its validity has never been questioned upon the grounds which are now urged against it, and the only objection ever before urged against its validity was, that the legislature had no constitutional power to pass such acts, which objection was long ago overruled by the courts, and many rights have accrued under the act in the honest belief of its validity, *held,* that unless a very clear showing of invalidity can now be made out, it will be the duty of the courts to hold the act valid.

4. ———— *Passing Bills; Yeas and Nays, on Concurring in Amendments.* Where such an act was duly passed by both branches of the legislature more than eleven years ago, and the senate journal shows that the senate concurred in certain slight amendments made to the bill by the house, but does not show affirmatively whether the yeas and nays were taken on such concurrence, and the yeas and nays on such concurrence are not entered on the journal, and the act has generally been considered valid, and many rights have accrued thereunder, *held,* that said act will not now be declared invalid, merely because the said yeas and nays were not entered upon the senate journal, as aforesaid. [Following *Haynes v. Heller,* 12 Kas. 383, 392. See also, *Division of Howard County,* 15 Kas. 195, 214.]

5. AUTHENTICATING BILLS PASSED; *Signatures of Presiding Officers.* The signatures of the presiding officers of the two houses of the legislature to an enrolled bill, are only portions of the many evidences of the due passage and validity of such bill; and courts must decide as to the passage and validity of a bill upon the whole of the legal evidence applicable in such cases. Therefore, where the enrolled bill of a certain act, and the legislative journals, taken together, clearly show that the bill was duly passed by the legislature, and approved by the governor, and where all the intrinsic evidence having any application to the case, also clearly shows the same thing, *held,* that the bill should be held to be valid, although it may not have the signature of the presiding officer of the senate affixed to it.

6. ———— The publication of said act in the "Leavenworth Daily Conservative," the failure to publish the signatures to the act, and other matters, considered in the opinion.

### *Error from Leavenworth District Court.*

On the 20th of March 1874, *Higginbotham* commenced his action in the district court against the plaintiff in error, to recover the principal and interest due on bonds numbered 33, 34, 68 and 77 of series B, and 32, 33, 68, 98 and 104 of series C, of the bonds of the county of Leavenworth made and issued to the Union Pacific Railroad Company on the 1st of August 1865. The action was tried by the court below without a jury, at the May Term 1874. Special findings of fact were made and found, and judgment thereupon rendered in favor of *Higginbotham* for $3,464.46, and costs of suit. It was claimed by the county, and the court found as a fact, that there was once duly levied and collected by the county sufficient funds to pay the bonds in question; but the court also

found that the funds so raised and paid into the county treasury "were appropriated for different purposes and were not used in paying these bonds." Other facts, and the facts in regard to the passing and publishing of the act under which the bonds are issued, (ch. 12, Laws of 1865, pp. 41, 42,) are stated in the brief of plaintiff in error, and in the opinion, *infra.* The *Board of County Commissioners* brings the case here on error.

*John C. Douglass,* and *L. M. Goddard,* for plaintiff in error:

Plaintiff in error rests its defense to the action below upon two different theories: *First,* That the pretended bonds sued on are void *ab initio,* and have never been so ratified as to become the bonds of the county; and *second,* that plaintiff below has no cause of action against said county, as it appears from the evidence and by the finding of the court below, that the county had *levied and caused to be collected,* taxes for the express purpose of paying these bonds, and sufficient in amount to pay them long before this suit was commenced.

1. The application of funds to other purposes than the sinking fund, is *ultra vires* of the county, and of its officers and treasurer. Brice Ultra Vires, 59, 58, 62, note *g,* and pp. 83, 84, note *s.* The county board had performed its whole duty in the premises. The holder of its bonds had a complete remedy against the treasurer and his bond to compel the proper application of the funds collected for his use; and if he negligently stood by and silently acquiesced in its misappropriation by the treasurer, he cannot now compel the county to make a second levy upon all the property of the county to pay his claim that had been previously provided for. (4 Kas. 250, 260, 421.) And the county board had a duty to perform of a corporate character, and having performed that duty once, its power to do that act was exhausted. It had no power to act a second time. Moreover, if these bonds were valid, it was the legal duty of the county board to levy a tax in 1866 to pay "*Series A,*" and in 1867 to pay "*Series B,*" and in September 1868, to pay "*Series C,*" and sufficient

to pay the same; and if the county board did not do so, a cause of action arose against the county and in favor of the holders of these bonds at the date of each such default of duty, which in each case was more than five years before the commencement of this suit, and hence the same was barred; Civil code, § 25; Dil. on Munic. Corp., § 405, note 4; 4 Texas, 470; 17 Cal. 172.

2. But our primary defense to this action was based on our theory above, that the bonds sued on were void from the beginning, and have never been validated. We do not care in this case to raise the question of constitutional authority in the legislature to authorize the issuance of bonds in aid of railway companies; and for the present will consider the question as affirmatively settled by this court. Yet we submit, that the following propositions must be admitted as true, to-wit: that against the settled view of constitutional authority, there exists a very vigorous and very respectable minority protest; "that this invention to aid the enterprises of private corporations has proved itself baneful in the last degree;" (Dil. Munic. Corp., § 104;) that all those maxims of the law requiring strictness of construction against corporations and inferior courts in determining their grants of power, and the mode of exercising the same, should be applied without stint or reserve in this case; that the board of county commissioners is an inferior court of special and limited statutory jurisdiction, and its records are the *only* evidence of its proceedings, (26 Mich. 44,) and that it must appear therefore, upon the face of the proceedings, that its action was conformable to the requisitions of the statute governing it; 10 Ind. 361; 2 Ind. 53; that when statutory powers are conferred upon a court of inferior jurisdiction, and a mode of executing those powers is prescribed, the course pointed out must be substantially pursued, or the acts and judgments of the court are *coram non judice*, and void: A. & A. Corp., §§ 211, 253; 2 Kas. 115, 128, 371; 12 Iowa, 153; 37 N. Y. 203; 1 Pet. 340; 3 Cranch, 331; 27 Ind. 235; 5 Blackf. 462. (Sec. 2 of Kas. code of 1859,

and § 2 of code of 1868, do not apply to statutes other than the code, hence the exception proves the rule.)

In the light of the foregoing premises, we submit that the pretended session of the county board, (the plaintiff in error,) on the 6th of June 1865, was void. This was the *eleventh* meeting of said board in its May term, and on that day the order was made calling the election to vote these bonds. Under the law the board could not meet more than *nine* days in one term. Hence the meeting was void, and all its acts, votes, and orders on that day were *coram non judice*, and void: Comp. Laws of 1862, p. 411, § 12; 50 Mo. 321; 27 Me. 114. Only in exceptional cases could the board meet more than six days, and in these only nine — the language is equivalent to a negative: 10 Ind. 359; 8 Blackf. 471, 476; 2 Scam. 227; 1 Cent. Law Jour. 218. And the county board could not adjourn to a day beyond the term prescribed by law: 8 Cow. 286; 1 Seld. 22; 4 N. Y. Dig., "Towns and Town Meetings." The said meeting of June 6th was the same as no election — a nullity — and hence the question in this case is, are bonds issued by the county board, without an election or vote of the people, valid in the hands of the plaintiff? See Dil. Munic. Corp., §§ 136, 418, 419, 423, 426; A. & A. on Corp., §§ 111, 253; *Lewis v. Bourbon Co.*, 12 Kas. 186; 15 Ohio St. 437; 27 Penn. St. 389; 38 Ill. 44; 19 Iowa, 199, 210; 10 Wall. 676; 36 N. Y. 224; 22 Ind. 88, 503; 51 Mo. 483; 18 Grat. 338; 15 Mass. 537; 21 How. 356.

3. By said act — Laws of 1865, ch. 12 — there are a number of steps or acts that are material and preliminary to the issuing of railroad-aid bonds, and that are *conditions precedent to the power to issue*, which are wanting in these bonds. The law requires the amount of stock subscribed to be first fixed — determined by the people by vote. They cannot delegate this power to the commissioners, as was done in this case; 27 Penn. St. 389; 22 Ind. 88; 23 Mo. 483. The record nowhere shows, nor do the bonds recite, nor does the petition allege, nor does the evidence show, that these bonds were issued in payment of assessments made upon all the stock of the

company. Of the bonds which were issued, and all done as one act, $100,000 were made payable September 1st 1885, more than twenty years from the date of their issue; 1 Cent. Law Jour. 106; Story on Agency, §§ 169, 175; 2 Johns. 48. These bonds are made payable in the city of New York, being without the limits of the county and state, and not authorized by any law; 19 Ill. 414. The rate of interest being seven per cent. per annum, payable semi-annually, is equivalent to $7\frac{1}{8}$ per cent., and is, by so much, in excess of power, and therefore the bonds are void; 5 Ohio St. 113; 1 Wend. 556. The question of *subscribing for stock* was not submitted to the voters, but only the question of *issuing bonds*. The exact amount of the bonds or stock, whether $100,000, or $250,-000, the time to run to maturity, whether one year or twenty years, the rate of interest, whether one per cent. per annum, or more, so as not to exceed $7\frac{1}{8}$ per cent. per annum, were not submitted to the voters; nor did the voters fix or at all determine any one of these fundamental points as requisites. These matters were for their own deliberation and choice, and the voters could not delegate them to the county board. And much less could a small minority of voters so delegate such power; *Lewis v. Bourbon County*, 12 Kas. 186; Dil. Munic. Corp., § 423; 27 Penn. St. 389; 48 Mo. 242; 22 Ind. 88; 27 N. Y. 439. There is no evidence that notice was given of the said pretended election, either in the record of the proceedings or the face of the bond. There is no evidence that the Union Pacific Railway, or the Kansas Pacific Railway, was located to, into, through, from or near the county of Leavenworth in 1865, or even at the time this suit was commenced. And it follows, that the county had no power to issue these bonds, or any bonds to said railroad, and hence they are and were void; 1 Dillon C. C. Rep. 263.

4. These bonds, void at the beginning, have not been ratified or validated. The county board alone could not ratify by the levy of taxes, nor indeed by any act the most solemn, inasmuch as it could not in the first place *ex suo sponte* create the debt or issue the bonds; 38 Ill. 44; 57 Ill. 30; 14 Ohio,

569; 19 Wis. 280; 10 Wal. 676; Dil. Munic. Corp., §§ 385, 387; 3 Kas. 121; 8 Paige, 527; 24 Wend. 432. The people of the county alone could not ratify by silence, nor by paying taxes, nor by any vote or public expression, unless in some mode authorized by constitutional law—and all reasonable doubts as to the intent of the legislature should be resolved in favor of the citizens; 27 Wis. 522; 30 Wis. 237. The legislature alone could not ratify; Dil. Munic. Corp., § 387; 2 Kas. 115; 51 Ill. 17, 58; 55 Ill. 33, 133; 29 Wis. 413; 26 Wend. 192; 17 N. Y. 449, 454; Cooley Const. Lim. 231, 235, 379, 382. Nor have these bonds been ratified or validated by the combined acts of the legislature, the county board, and the people of the county. We are referred to ch. 32, Private Laws of 1868, p. 69, "an act to authorize Leavenworth county and the city of Leavenworth to dispose of stocks in railroad corporations." Viewed as an act intended to ratify or validate these bonds—that which is claimed for it—it becomes repugnant to § 16 of art. 2 of the constitution. The title to said ch. 32 contains no allusion to these or any other bonds. It contains one subject, and but one, and that is clearly expressed.

5. But, we deny that the pretended law, under which it is claimed that these bonds were issued, was a law at the date of the issue of these pretended bonds, or that it is a law now, or that it ever became a law of the state of Kansas. By the terms of the 10th section of said act, and the certificate of the secretary of state, it appears that the act was not published as directed by the legislature. The court cannot say that the "Leavenworth Daily Conservative" is the "Daily Conservative." And, until published by the authority of the legislature, it did not become a law; Const., art. 2, § 19; 34 Ill. 293; Cooley Const. Lim. 157; 16 Ill. 361; 10 Wis. 136; 20 Wis. 50; 16 Ind. 48; 9 Kas. 550. Again, the act was not published in the Conservative, inasmuch as it did not contain the signatures of the presiding officers; Const., art. 2, § 14. And all the acts of the county, and of the voters of the county, precedent to the issue of

these pretended bonds, had occurred, so far as they did occur, prior to the 19th of June 1865, when said act was published in the statute book.

6. This pretended law is shown by the senate journal not to have been passed as required by the constitution. The yeas and nays were not taken on its final passage, and entered on the journal; Const., art. 2, § 10; Senate Journal 1865, p. 275, Feb. 8th. House amendments, on motion, were concurred in without yeas or nays, or entry on journal; Cooley's Const. Lim. 135, 140; 14 Ill. 326; 14 Ill. 297; 25 Ill. 183; 2 Cal. 168; 16 Peters, 56; 20 Ohio St. 1, 17; 2 Hill, 31.

7. This pretended law of 1865 is shown, by reference to the original enrolled bill, never to have been signed by the presiding officer of the senate, as required by Const., art. 2, § 14. These requirements of the constitution not being observed, the law is a nullity; 8 Ind. 157, 160; Cooley Const. Lim. 152; 2 Hill, 31; 4 Hill, 384; 2 Cal. 168. And this, notwithstanding the governor's signature; 52 N. H. 622; 26 Penn. St. 450; 3 Penn. St. 42; 3 Heisk. (Tenn.) 422; 2 Minn. 330; 2 Cal. 172. And it is equally void whether, the signatures of only one or both of the presiding officers are wanting.

*Clough & Wheat*, and *Wm. Higginbotham*, for defendant in error:

1. It appears from the findings that the bonds in suit were issued, dated of the 1st of August 1865, as part of $250,000 in amount of bonds of said county issued in conformity with the act entitled "An act to authorize counties and cities to issue bonds to railroad companies," approved February 10th 1865—being ch. 12, Laws of 1865, pp. 41, 42. And we refer to that part of the opinion of this court in the case of *Leavenworth Co. v. Miller*, which is on pages 500 and 541 of 7th Kansas, and submit that the same is conclusive against plaintiff in error.

2. Plaintiff in error claims that said act was not constitutionally enacted, or put in force. We suppose that under said decision in the *Miller case*, and the several other cases

decided by this court, where bonds had been issued under said act, enough has been determined—at least, when coupled with the fact that said act has been hitherto by the courts, county, people, legislature and ministerial and executive officers of the state, treated as a valid law in the manner, and under the circumstances under which it has been so treated—to set at rest any question of the validity of that act, and prevent any successful preëmption of a new way to repudiate debts. At its very next session after its passage, the legislature of the state, in the most formal manner that it could, recognized that act by amending the first two sections thereof, and declaring that the third and fourth sections thereof should be applicable to the amendatory act. (See pages 72 to 74, Laws 1866.) And this legislature of 1866, by the joint resolution shown on pages 249 and 250, Laws 1866, also recognized and referred to the stock which the county got for the aforesaid $250,000 of bonds. But as to whether said act of 1865 was constitutionally enacted or put in force, we refer to the senate and house journals of 1865, and submit that said journals are sufficient to show that whatever was necessary to make a valid concurrence in the passage of the bill, and in amendments thereto, was done. See 3 Ohio St. 484; 11 Ind. 433, 434, 435; 12 Kas. 382, 392—and especially the reporter's notes on pages 383, 384, of 12 Kas., and also pages 433 and 434 of the Indiana case, concerning concurrence in amendments. See also, 33 N. Y. 285.

3. With reference to the claim that said act of 1865 was not signed by the presiding officer of the senate, we submit that the presumption is, that the presiding officer of the senate for the time being was absent during the two days mentioned in § 14 of art. 2 of the constitution, in which he should have signed; and we further submit that the requirement of that section, that the presiding officers of the two houses should sign, is merely directory; 8 N. Y. 328; 11 Ind. 432; 4 Cal. 388; 3 Ohio St. 483; 6 Ohio St. 179; Potter's Dwarris on Stats. 221, 222; 25 Ill. 182. Those officers had no discretion in the matter. It was their duty

to sign the bill, which duty could have been enforced by *mandamus*, if they could have been got at. Surely, those officers could not defeat the will of the members of the two houses and of the governor, by keeping out of the way of a mandamus for the two days. If either of those presiding officers could prevent a bill from becoming a law by refusing to sign it, then we submit, he has greater power than the governor. If the county's claim is right in that respect, then if either of the presiding officers refuse to sign, the bill must fall dead right there. *Mandamus* could not ordinarily be made operative in the two days. Those presiding officers probably have the whole of the two days in which to sign. If plaintiff's claim is right could they afterward sign? We submit that said requirement of signing by the presiding officers was only intended as matter of cumulative evidence, to assist in the matter of determining the identity of the bill, and is only directory. If the makers of the constitution had intended by the language used in that connection, to give either of the presiding officers such great power to prevent legislation, as they respectively would have, if their signatures to bills were necessary, it is, from the provisions of the constitution in relation to the veto power of the governor, and the right of the legislature to pass laws over the governor's veto, evident and certain that provision would have been made to obviate such effect of the want of the signatures of the presiding officers.

4. The claim of plaintiff in error that the law was not duly published, is too fine for extended comment; and further, the same act was published on the 19th of June 1865, with the other laws of the same session, and by § 4 of the act previous submissions were made valid.

5. If for any reason the court shall be of opinion that the bonds were issued illegally, or without authority, or that said act of 1865, was not a valid law, then in addition to the matters aforesaid we refer to the act in relation to taxation in the county of Leavenworth, laws of 1871, p. 326, and to the law amendatory thereof, laws of 1872, p. 290, and to the

findings, showing taxes were levied under those laws to pay interest on the bonds sued on with other similar bonds; and to the findings which show interest on all the bonds sued on paid to defendant in error up to some time in 1873 — whereby the issue of said bonds was ratified, and the bonds made legal and valid obligations against the county; 3 Kas. 104, 121. And in the same connection, and as showing ratification, we refer to the joint resolution aforesaid, and to pp. 69, 70, Special Laws 1868, and to § 7, p. 184, Laws 1871, and to the findings, which show that the electors of the county have themselves, by an overwhelming majority, at an election ratified the issuing of said bonds, and by authority of law — said resolution and the section last aforesaid — duly disposed of the consideration, the stock for which said bonds were issued. See also, 44 Mo. 201; Laws of 1874, p. 130. In view of these oft-repeated ratifications, different ones of them sufficient alone to legalize the bonds, it is something more than absurd to claim that plaintiff in error is not now bound to pay the bonds.

6. With reference to the limitation question, we refer to § 24 of the code of 1868, and to the matters aforesaid in relation to ratification which occurred within the five years next before the suit was brought, and to the payments made within that time as shown by the findings; 55 N. Y. 495; 17 Cal. 172.

With reference to the claim of plaintiff in error that some of the laws, and said joint resolution, in relation to Leavenworth county, are void, because of § 1 of art. 12, or § 17 of Article 2 of the constitution, we refer to the case of *Beach v. Leahy*, 11 Kas. 23.

As to the jurisdiction of the county board, we suppose the joint resolution aforesaid, and the act of 1868, (Special Laws, pages 69, 70,) the laws of 1871, 1872 and 1874, about levying taxes, and the doings of the board and county in the matters of ratification aforesaid, unquestionably cure any defect, including the one about such number of days, if it was a defect. But we submit that it is evident from the

reading of §§ 12 and 14, page 411, Comp. Laws 1862, that it was simply intended to limit their pay to nine days in each term, and not to limit their power within that period.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by John Higginbotham against Leavenworth county on certain bonds issued by said county to the Union Pacific Railway Co. The county says in its brief in this court, that it "rests its defense upon two different theories—*first*, that the pretended bonds sued on are [were] void *ab initio*, and have never been so ratified as to become the bonds of the county; *second*, but if

1. Debt not paid by mere levy of taxes.

valid, still that the county had *levied and caused to be collected* taxes for the express purpose of paying these bonds, and sufficient in amount to pay them long before this suit was commenced;" and that as these bonds had been due more than five years when this suit was commenced, all action on the same was at that time barred by the five-year statute of limitations. With regard to the second theory of the plaintiff in error, we would say: First— Admitting "that the county had levied and caused to be collected taxes for the express purpose of paying these bonds, and sufficient in amount to pay them long before this suit was commenced," still the county never has paid them; it refuses to pay them, and has used the money collected for their payment for other purposes. Such a defense as the above is therefore hardly sufficient. And second—Admitting that more than five years had elapsed after these bonds became due, and before this suit was commenced, still, the county in 1873 paid all the interest due on said bonds up to that time, and has otherwise in writing and repeatedly acknowledged its own liability on said bonds. The cause of action therefore is evidently not barred. (Civil Code, § 24.)

Turning now to the first theory of the plaintiff in error, defendant below: Are said bonds valid? The defendant below claims that they are void; *first*, because the act of the legislature under which they were issued never became a law;

6—17 KAS.

*second,* because the bonds were not legally issued under the act. The defendant claims that said act never became a law,

**2. Statutes not to be lightly impeached.** and is therefore void, for the following reasons: 1st, because the yeas and nays were not called and entered on the senate journal on the final passage of the act in the senate; 2d, the enrolled bill of the act was never signed by the presiding officer of the senate; 3d, the act was published in the "*Leavenworth* Daily Conservative," when it should have been published in the "Daily Conservative;" 4th, the signatures of the officers of the two houses affixed to the act were not published with the act. (Ch. 12, Laws of 1865, pp. 41, 42.) This act was passed and published more than eleven years ago. Since that time all the departments of the state government, the legislative, the executive, and the judicial, have held it to be valid. (Laws of 1866, pp. 72 to 74, 249, 250; *Leavenworth Co. v. Miller,* 7 Kas. 479; *Morris v. Morris Co.,* 7 Kas. 576.) Its validity has never before been questioned upon any such grounds as are now urged against it. The only objection ever before urged against its validity was, that the legislature had no constitutional power to pass such acts; and that objection was long ago overruled by the courts. Many rights have accrued under the act, in the honest belief of its validity. And therefore, unless a very clear showing of invalidity can now be made out against it, it will be the duty of the courts to hold the act valid.

The question raised by the first objection to the act we think has been settled by the decision of this court in the case of *Haynes v. Heller,* 12 Kas. 384, reporter's note, and

**4. Passing bills; yeas and nays.** p. 392, opinion. See also, *Division of Howard County,* 15 Kas. 195, 214. Said act was Senate Bill No. 63, being senate bills Nos. 62 and 63 consolidated. On its final passage in the senate *the yeas and nays were taken and entered on the senate journal,* precisely as the constitution requires. The bill was then taken to the house of representatives, where it was properly passed, with certain slight amendments, and was then returned to the senate for its concurrence. The senate journal then shows that, "Mr. Gamble moved

that the senate concur in the house amendments to Senate Bill No. 63, 'an act to authorize counties to issue bonds to railroad companies.' Motion prevailed." Here is where it is claimed that the yeas and nays should have been taken and entered upon the journal. But what is there even here, and in this place, that shows that the yeas and nays were not taken? It is true, the clerk failed to enter them upon the journal; but as to whether they were actually taken or not, the journal is silent. And mere silence of record, does not as a rule invalidate the proceeding. It is a general principle of law, that it will be presumed, in the absence of anything to the contrary, and in favor of the regularity and validity of the official proceedings of any official body having superior jurisdiction, that whatever ought to have been done was not only done, but rightly done. (*McCulloch v. The State*, 11 Ind. 425, 433 to 435. As to courts, see *Hunter v. Furguson*, 13 Kas. 462; *Ogden v. Walters*, 12 Kas. 283.) The journal shows that the "motion prevailed;" but in what manner the vote was taken, the journal does not show.

Whether the failure of the presiding officer of the senate to sign the enrolled bill of said act, invalidates the law or not, is the main question in this case. Indeed, it is the only new question that merits any consideration from this court. The constitution requires that "Every bill and joint resolu-

5. Authenticating bills. tion passed by the house of representatives and senate shall within two days thereafter be signed by the presiding officers, and presented to the governor," etc. The regular presiding officer of the senate is the lieutenant-governor. (Const., art. 1, § 12.) But the senate may also elect a president *pro tem.* of the senate, who may preside in case of the absence or impeachment of the lieutenant-governor, or when the lieutenant-governor holds the office of governor. Now it seems from the book of enrolled bills of the session of the legislature of 1865, that the regular president of the senate signed very few of the bills passed at that session. The most of them were signed by the president *pro tem.* But some of them however were not signed by any

presiding officer of the senate, among which was the bill now under consideration. The bill now under consideration was signed by the secretary of the senate, by the speaker of the house, by the chief clerk of the house, and by the governor. Does the failure of the presiding officer of the senate to sign said bill, invalidate everything cannected therewith? If it does, then the presiding officer of the senate has more power to veto bills than the governor, or than any other person or officer in the state. The legislature may pass a bill over the veto of the governor; but if the plaintiff in error is correct, they cannot pass a bill over the veto (so to speak) of the lieutenant-governor, so as to make the bill become a valid law. The lieutenant-governor is the president of the senate; he holds his office independent of the legislature; they have no power to remove him from office, except by the slow and tedious proceeding of impeachment; they have no power to compel him to sign a bill, except by the equally slow and tedious proceeding of mandamus, and this can only be done in the courts; and if the plaintiff in error is correct they have no power to make a valid law except with the aid of his signature, so long as he is the acting presiding officer of the senate. Of course, he has the whole of the two days given him within which to sign a bill. He would not be in default—no action could accrue against him for any supposed default, prior to the expiration of the two days. And upon the theory of plaintiff in error, when the two days have elapsed, if the bill has not yet been signed, it has become defunct. Everything connected therewith is dead. All the proceedings of the legislature with reference thereto have been annulled; and there is no power anywhere that can ever afterward breathe life or vitality into them again. The constitution provides that when a bill has passed the two houses it "shall *within two days* thereafter be signed by the presiding officers," etc.: (art. 2, § 14.) And there is no power given by the constitution or elsewhere for the presiding officers to sign the bill at any time subsequent to the expiration of said two days. Plaintiff in error claims that this provision

of the constitution is absolutely mandatory, and therefore
that no valid law can be made unless its terms are fulfilled
to the very letter, and therefore no valid law can be made
unless the bill is signed by the presiding officers of the two
houses within the prescribed two days.  To admit that a bill
might under any circumstances become a law without being
signed within the two days, would be to admit that said pro-
vision of the constitution is not mandatory.  It would be to
admit that a law might be made without said provision being
strictly complied with.  It would be to admit that a failure
on the part of the presiding officers to sign a bill within the
two days does not absolutely destroy the life and vitality of
the bill, and render all the proceedings of the legislature with
reference thereto nugatory.  And to admit that an action of
mandamus would under any circumstances lie to compel a
presiding officer who had failed to sign a bill for more than
two days to afterward sign the same, would be to admit the
foregoing.  It would be to admit that a bill might become a
law, although it was not signed within the two days as pre-
scribed by the constitution.  We think that mandamus would
lie in such a case; but ordinarily it would be a very inade-
quate remedy.  It would lie for the purpose of furnishing
the additional evidence which the signatures of the presiding
officers would give as to the passage and the validity of the
laws, but it would ordinarily be a very inadequate remedy,
if, as the plaintiff in error claims, the validity of the law
depends entirely upon the signatures of the presiding offi-
cers; for ordinarily, nearly all the bills of any particular
session are passed just before the close of the session; and
ordinarily, before any action of mandamus could be heard
and determined the legislature would be adjourned *sine
die*.  Therefore, as the action of mandamus would ordinarily
be a very inadequate remedy, it would be extremely unfortu-
nate if it were the only remedy.  If it were the only remedy,
then the power of the presiding officers to practically annul
the proceedings of the legislature, to practically veto the bills
passed by the legislature, would be almost as absolute as if

no such remedy were in existence. But we think that mandamus is not the only remedy so far as determining the validity of the law is concerned. The signatures of the presiding officers do not constitute any portion of the law. It is not necessary that the consent of the presiding officers should be had in order to enact the law. The only office that the signatures of the presiding officers is intended to perform, is to furnish evidence of the due passage and validity of the bill. Such signatures are only portions of the many evidences of the due passage and validity of the bill. And a bill may in some instances, as we think, be valid, although the signatures of one of the presiding officers may be omitted. With one of such signatures gone, the evidence of the passage and validity of the bill would of course be somewhat weakened. If the signatures of both of the presiding officers were gone, the evidence would of course be weaker still. If in addition to this, the journals did not show the passage of the bill, then the evidence of its passage would be almost wholly gone. And taking the whole of the evidence together, if it should not clearly appear to the courts that the bill had been passed by the legislature, and approved by the governor, it would be the duty of the courts to declare that the bill had never become a law. The courts must decide as to the passage and validity of a bill upon the whole of the legal evidence applicable in such cases. If the enrolled bill were perfect and formal in every particular, then the courts might say that the bill had passed and become a law, although there might be omissions from the journals. (See authorities cited in 15 Kas. 211, and *State v. Swift*, 10 Nevada, 176.) Or, if the journals were perfect in every particular, and showing that the bill had been regularly and duly passed, then the courts might say that the bill had passed and become a law, although there might be some omissions from the enrolled bill. The enrolled bills and the journals of the legislature are the principal evidences of the passage and validity of a bill, and generally they cannot be contradicted. Probably they can never be contradicted if they are harmonious with themselves and with

each other. (*Division of Howard Co.*, 15 Kas. 194.) But in doubtful cases, extrinsic evidence may probably be received to corroborate what they seem to prove, or to explain the doubtful import of their language. We think that the enrolled bill and the legislative journals in the present case, when taken together, clearly show that the bill now under consideration was duly passed by the legislature, and approved by the governor, and that it regularly became a valid law. And all the extrinsic evidence having any application to the case also clearly shows the same thing. Among the evidences (record and extrinsic) which show that said bill has become a valid law are the following: The legislative journals show beyond all doubt that the bill passed the two houses. The senate journal shows that the bill passed the senate. The house journal shows that the secretary of the senate reported to the house, that the bill had passed the senate. The house journal also shows that the bill regularly passed the house, with amendments. The senate journal shows that the senate concurred in the house amendments. The house journal shows that the secretary of the senate reported to the house that the senate had concurred in the house amendments. The senate journal shows that the committee on enrolled bills reported to the senate that the bill had been correctly enrolled, and presented to the governor for his approval. And the senate journal also shows, that the governor reported to the senate that he had approved the bill. The enrolled bill is now preserved in the office of the secretary of state, bound in a book along with the other enrolled bills of that session, and it contains the following evidences of its own passage and validity: It contains the certificate and signature of the secretary of the senate, showing that the bill passed the senate; the certificates and signatures of the speaker and the chief clerk of the house, showing that the bill passed the house, and inferentially that it passed the senate; and the signature and approval of the governor, which inferentially shows that it passed both houses. The bill has been published as a law by the secretary of state, both in a newspaper and in the

statute book. (Laws of 1865, pp. 41, 42.) It has subsequently been recognized as a law by the legislature and the governor; (Laws of 1866, pp. 72 to 74, 249, 250;) and also by the courts; (7 Kas. 479, 576.) And indeed, it has generally been recognized to be as much a law as any other law on the statute book. And the question that it was not duly passed, or signed, has never been raised until recently, although it has been on the statute book for over eleven years. We think the mere failure of the president of the senate to do his duty cannot have the effect to invalidate the law.

The defendant in error says in his brief, that "The claim of the plaintiff in error that the law was not duly published, is too fine for extended comment; and further, the same act was published on the 19th of June 1865, with the other laws of the same session, and by § 4 of the act previous submissions [to the people of the question of voting bonds, etc.,] were made valid," etc. We suppose that the plaintiff in error, through its agents and counsel, knows that the "Leavenworth Daily Conservative" was the only "Daily Conservative" in the state, for such was the fact; but how it knows that the signatures of the officers affixed to the act were not published, we are not informed. But suppose they were not published: we do not think that such omission would invalidate the law. If it would, then the plaintiff's present petition in error in this court should be dismissed for the following reasons: Neither the signatures to the act defining the jurisdiction of this court, (Gen. Stat. 299, 300,) nor the signatures to the act authorizing petitions in error, (Gen. Stat. 735, 736,) have ever been published. We think the act in the present case was properly published.

Plaintiff in error claims that said bonds are void because, as it claims, they were not issued in accordance with said act of the legislature, and urges several reasons for this claim. Some of these reasons controvert the facts as found by the court below, and as they ought to have been found; some of

*6. Publication of laws.*

them controvert the law; some of them have already been considered and decided by this court in the case of *Leavenworth Co. v. Miller*, 7 Kas. 541; and none of them are tenable. Making the bonds payable in New York, and making the interest seven per cent. per annum, payable semi-annually, certainly does not invalidate the bonds.

We think the election to vote upon the question of issuing the bonds was valid, although it was called by the county board on the eleventh day of their May term 1865. (See arguments of counsel in their briefs.) There are probably good reasons however why the bonds should be held valid, even if said election was not strictly valid. They have been ratified, not only by the county board, but substantially by the legislature, and by the people of Leavenworth county themselves.

The judgment of the court below must be affirmed.

All the Justices concurring.