[No. 1161.]

THE STATE OF NEVADA, EX REL. JAMES CARDWELL, RELATOR, *v.* M. M. GLENN, ET. AL. FUNDING COMMISSIONERS OF ESMERALDA COUNTY, RESPONDENTS.

CONSTITUTION—PROVISIONS OF, MANDATORY.—The provisions of section 18 of article IV of the constitution, requiring the signing of bills and joint reso-

lutions, by the presiding officers of the respective houses, and by the secretary of the senate and clerk of the assembly, are mandatory and must be complied with.

EVIDENCE OF THE EXISTENCE OF A LAW.—This court will not look beyond the enrolled bill in order to ascertain the terms of a law. The fact that it is signed by the proper officers of each house, approved by the governor and filed in the office of the secretary of state, is conclusive as to the passage of the act as enrolled, and is the only evidence thereof. (*State ex rel. George* v. *Swift*, 10 Nev. 176, and *State ex rel. Chase* v. *Rogers*, 10 Nev. 250, affirmed.)

CONSTITUTION—SECTION 18 ARTICLE IV CONSTRUED—ASSISTANT SECRETARY MAY SIGN BILLS.—*Held*, that the signature of the assistant secretary of the senate is a substantial compliance with the provisions of the constitution requiring all bills to be signed by the secretary of the senate.

IDEM.—These provisions of the constitution must be construed with reference to existing customs in legislative and parliamentary bodies, and courts, in cases of doubt, should take into consideration the construction which has been deliberately given to the provisions of the constitution by the co-ordinate departments of the state government.

WHEN PRESIDENT OF CORPORATION MAY EXECUTE A DEED AND DONATE LANDS TO A COUNTY.—A resolution passed by the trustees of a corporation "that the president be, and is hereby authorized, on behalf of the company, to deed and convey to purchasers, at his discretion, town lots in the town of Hawthorne," is sufficient to authorize the president, on behalf of the corporation, to execute a deed and donate the land therein conveyed, to a county.

IDEM—DEED—CONSTRUCTION OF.—The president executed a bargain and sale deed of certain lots to the county of Esmeralda, without the payment of any money, "for the purpose of erecting thereon county buildings, to which the same is hereby dedicated for the use and benefit" of the county : *Held*, that the deed complies with the statute, that it amounts to a donation of land to the county for the purpose therein expressed, and if the land is used for such purpose the county will own the land as absolutely as if it had obtained the same by purchase.

MORTGAGE UPON A RAILROAD—HOW CONSTRUED.—In construing a mortgage given by a corporation upon its railroad which minutely designates the line of road, specifies all the lands of an average width of sixty feet, upon which the road is located, necessary for the use and operation of the road, its rolling stock, superstructures of every kind and then adds " and all rights, privileges, franchises, and property whatsoever, now belonging or to be acquired by said party of the first part :" *Held*, that it should be construed as conveying only such property as was or would be employed and be useful or necessary in the construction, maintenance, operation, preservation or security of the railroad mortgaged and that it did not include other property owned by the corporation not used, or to be used, in connection with the railroad, in promotion of the direct and proximate purpose of its construction.

APPLICATION for *mandamus.*

The facts are stated in the opinion.

*Thos. H. Wells* and *A. C. Ellis*, for Relator:

I. Section 18 of article IV is directory only.

A distinction is clearly taken by the constitution between the passage of a bill and its becoming a law, and yet if we construe the constitution literally, when it has been passed by the two houses, regardless in certain cases of the signature or approval of the governor, it may become a law. (Art. IV, sec. 35.) It is nowhere provided in the constitution the signing of bills which may have passed both houses shall be a condition precedent to their becoming a law.

The power to enact a law without the signatures of these clerks to the same, is not denied to the legislature ; as in many other instances of substance and power, as illustrated in secs. 21 and 22 of const. All such affirmative prescriptions of duty are held directory. (Smith Com. secs. 679, 681, 835, 837 ; Sedg. Stat. and Con. Const. 324, 412, 413 ; Cooley Cons. Lim. 182, sec. 150 ; *Washington* v. *Page,* 4 Cal. 388 ; *Miller* v. *State,* 3 Ohio St. 475 ; *Pim* v. *Nicholson,* 6 Ohio St. 176 ; *Cottrell* v. *State,* 9 Neb. 129 ; *People* v. *Supervisors,* 8 N. Y. 328 ; *McPherson* v. *Leonard,* 29 Md. 377 ; *Hill* v. *Boyland,* 40 Miss. 618 ; *Swann* v. *Buck,* 40 Miss. 268 ; *Cape Girardeau* v. *Riley,* 52 Mo. 424 ; *St. Louis* v. *Foster,* 52 Mo. 513 ; *Wright* v. *Pinkerton,* 15 Ohio St. 573 ; *Pierpont* v. *Crouch,* 10 Cal. 316 ; *Striker* v. *Kelly,* 7 Hill, 24 ; *Marchant* v. *Langworthy,* 6 Hill, 647 ; *Pacific Railroad* v. *The Governor,* 23 Mo. 368 ; *Anderson* v. *Baker,* 23 Md. 585-6.)

II. It is manifest that the bill passed, from an inspection of the statute roll in evidence, for upon the back of this bound record appears the evidence that it passed and the majority by which it passed each body. The legislature has the power to prescribe the duties of secretary or assistant secretary, and the presumption is that the officer called assistant secretary has done his duty and told the truth.

*Bennett & Reddy,* for Respondents :

I. The signatures of the officers named in the constitu-

tion is the exclusive evidence of the passage of a bill.·
(*State ex rel George* v. *Swift*, 10 Nev. 189.)   The provision
requiring these officers to sign all bills is mandatory, because
not only an essential part of their duty but it is essential to
the validity of all bills, for if they fail to sign there would
be no evidence of the passage of the bill.

The same doctrine is applied in Burroughs on Pub.
Securities, 425 ; Cooleys Cons. Lim. 186 ; *State* v. *Silver*,
9 Nev. 231.   All the cases bearing on the point are fully
discussed in *State* v. *Rogers*, 10 Nev. 252-261.   Affirmative
words where they are peremptory are mandatory. (Dwar-
ris on Stat. and Const. 228 ; 5 Tex. 423 ; 1 Paine,
406.)

Bills must be signed by the officers named in the consti-
tution.   The assistant secretary of the senate is not the
secretary of the senate.   The constitution, in requiring
that bills passed should be signed by the secretary of the
senate, necessarily implies that the senate must have a sec-
retary, and therefore such secretary necessarily becomes a
constitutional officer.   How many clerks the senate should
employ, and how their officers should be designated, is all
left to the legislature.   But the senate having filled the
constitutional office, it is therefore beyond the power of the
legislature to thrust still another person in that constitutional
office to perform the act or acts specially enjoined upon the
constitutional officer, or to divide with him the power con-
ferred by the constitution.   The right to decide what bills
have passed the senate is an important trust and cannot be
delegated by the officer upon whom it is conferred. · That
such power has been conferred upon the secretary of the
senate there can be no question because so decided by this
court in *State* v. *Swift*, 10 Nev. 200.

By the Court, HAWLEY, C. J.:

This proceeding. was instituted for the purpose of com-
pelling respondents "to issue bonds for the purpose of creat-
ing a fund for the erection of county buildings." (Stat.
1883, 104.)   Its real object, however, is to determine whether

the "act to remove the county seat of Esmeralda county from the town of Aurora to the town of Hawthorne" (Stat. 1883, 95) is valid.

Respondents claim that this act is invalid because the enrolled bill is not attested by the signature of the secretary of the senate. The bill was signed by the presiding officers of the respective houses, by the chief clerk of the assembly, and by the assistant secretary of the senate. As thus attested, it was approved by the governor and regularly deposited with the secretary of state.

Section 18 of article IV of the constitution declares that "a majority of all the members elected to each house shall be necessary to pass every bill or joint resolution, and all bills or joint resolutions so passed shall be signed by the presiding officers of the respective houses, and by the secretary of the senate and clerk of the assembly."

Relator claims that this provison—relative to the signing of the bill—is directory merely. This view, in the light of the decision in *State ex rel. George* v. *Swift,* 10 Nev. 176, cannot be maintained. It was decided in that case that the courts could not look beyond the enrolled act, certified to by those officers who are charged by the constitution with the duty of deciding what laws have been enacted, and that when an act has been signed by the proper officers of each house, approved by the governor, and filed in the office of the secretary of state, "it constitutes a record which is conclusive evidence of the passage of the act as enrolled." The necessity of having some fixed and definite rule by which the existence of a law may be established, is so thoroughly and ably discussed in that opinion that it needs from us no further comment. If the rule of evidence as there established is right—and its correctness is not questioned by relator—then it follows, as clearly as the night follows the day, that the provisions of the constitution as to the signing of bills and joint resolutions is mandatory, and must be complied with, otherwise there is no evidence of the passage of a bill or joint resolution by the legislature that can be considered by the courts.

Nearly all of the decisions cited by relator, to establish the doctrine that this provision of the constitution is directory, were examined, and several of them reviewed, in *State v. Rogers,* 10 Nev. 250. We shall not, therefore, again enter into the general discussion of this subject, but will confine ourselves to such questions as have a direct bearing upon the particular question here presented. When the acts required to be done are of the essence of the thing, the provisions of the constitution, whether negative or affirmative in their terms, are imperative. Things which are not of the essence may be declared directory. The provision in question might be held directory by the courts in the various states where it has been decided—in opposition to the rule announced in *State v. Swift*—that the courts could look at the journals of the respective houses in order to determine whether any act had been passed by the legislature. The signature of one officer or of all the officers might be omitted without invalidating the the law. (*Cottrell v. State,* 9 Neb. 128; *Com'rs v. Higginbotham,* 17 Kan. 75.) But it cannot consistently be said, by a court which adheres to the principles announced in *State v. Swift,* that this provision is merely directory. We cannot look at the journals in order to determine whether the bill received the constitutional majority necessary for its passage. We must look to the enrolled bill, and to that alone. The constitution says that if the bill received the requisite majority it "shall be signed by the presiding officers of the respective houses, and by the secretary of the senate and clerk of the assembly." What was the object of this provision? There can be but one answer. It was to furnish the evidence that the bill thus attested had regularly passed the respective houses. It was intended that the bill thus attested, when signed by the governor and deposited with the secretary of state, should upon its face furnish the evidence necessary to make it a law. The signing of the bill by the officers designated in the constitution is absolutely essential to its existence as a law.

"This is the mode adopted for the authentication of

every bill." (*Pacific Railroad* v. *The Governor*, 23 Mo. 364.)   The governor's signature to a bill is not required as a means or part of its authentication, but as evidence of his approval.   Cooley in speaking of the signing of bills, says : " This is a constitutional requirement in most of the states, and therefore cannot be dispensed with."   (Cooley Const. Lim., sec. 153.)   Burroughs upon the same question says : " There are constitutional provisions requiring all laws to be signed by the speakers of both houses.   Where this provision exists in the constitution of a state, it is essential to the validity of an act in that state that the bill should be duly signed."   (Burroughs Pub. Sec. 425.)

The constititution of Indiana requires that a bill which passes each house " shall be signed by the presiding officers of the respective houses." . The supreme court, referring to this provision, use the following language : " What, then, was the purpose in requiring this attestation by the presiding officers ?   Was it intended as an idle form ?   It is not fair so to assume.   What possible object, then, was sought to be accomplished by it, unless it was to furnish evidence that the paper thus attested had been, by the proper processes of each house, clothed with the force of law—evidence upon the enrolled act itself, which should be taken as authentication and prove itself upon inspection ? " (*Evans* v. *Browne*, 30 Ind. 523.)

This brings us to the question whether the act under consideration is signed by the proper officers.   Is the signature of the assistant secretary a substantial compliance with the provisions of the constitution ?   Did the framers of the constitution intend that all bills should be signed by the chief clerk and the principal secretary, or was it their intention to allow this duty to be performed by their assistants when acting, as they often do, in the capacity of clerk and secretary of the respective houses ?   This provision of the constitution should be construed with reference to existing customs in legislative and parliamentary bodies.

The duties pertaining to the offices of secretary and assistant secretary, as prescribed by statute, should also be con-

sidered. At the time of the adoption of the constitution it was the custom of legislative bodies to have an assistant secretary of the senate and assistant clerk of the house. In the very nature of the office, independent of any statute, the assistant might take the place of the secretary or chief clerk, and for the time being discharge his duties. It is the duty of the secretary to be present during the entire session. If he neglects this duty, or is incompetent, he may be removed. (2 Comp. L. 2730.) But the legislature of this state, with the experience of other legislative bodies, foresaw that, without any fault upon his part, he might not, at all times, be able to attend to all the duties required of him, and provided for an assistant. Cases of emergency might arise. The secretary might be ill, or for some unavoidable cause, be temporarily called away. Leave of absence for the day might, for good cause shown, be granted him. The assistant could then be called to his desk, take his place, and discharge his duties. While acting in that capacity is he not, to all intents and purposes, the secretary? If in this official capacity he calls the roll of the senate and keeps the yeas and nays on the passage of the bill, is he not, by virtue of the provisions of the constitution, authorized to attest the vote so taken? Why not? He is authorized by law to discharge the duties pertaining to the office of secretary. He may call the roll and keep the tally of the votes. When he discharges this duty he is, in his official capacity, advised of the passage of the bill. The constitution does not impose the duty of signing bills and joint resolutions upon the individual, but upon the officer. It is the officer who is authorized to act as secretary that must attest the bills and joint resolutions. When the assistant so acts, does not the constitution mean that he may sign the bills and joint resolutions, and that full faith and credit should be given to his signature? It is true that the offices of secretary and assistant secretary are in one sense separate and distinct. They are held by different persons, who have different duties to perform. But is it not also true that these persons are authorized at times to perform the same

duties? Both may and do act as secretary of the senate. In this sense they discharge the duties of the office mentioned in the constitution. The secretary and assistant secretary, in the discharge of this duty, are called upon to exercise judgment and discretion. The power given by the constitution cannot be delegated to others.

At the first session of the legislature, after the adoption of the constitution, an act was passed giving the secretary authority to appoint an assistant. (Stat. 1864–5, 103, sec. 6.) Then, as now, it was made the "duty of the assistant secretary of the senate, and the assistant clerk of the assembly, to take charge of all bills, petitions, and other papers presented to their respective houses, to file and enter the same in the books provided for that purpose, and perform such other duties as may be directed by the secretary of the senate and chief clerk of the assembly." (Stat. 1864–5, 102, sec. 4; Stat. 1881, 17, sec. 4.) In 1873 the act was amended by providing that "all officers and employes of the senate and assembly * * * shall be elected by the senate and assembly respectively." (Stat. 1873, 155, sec. 6.) Whether appointed or elected, the assistant was authorized to act as secretary when requested so to do.

The constitution does not deal in details. In construing the provision in question, we must consider the modes of thought which gave expression to the language used, in connection with the usage and custom pertaining to the duty of the officer named in the constitution, in order to determine what was meant. The intention of those who framed the instrument must govern, and that intention may be gathered from the subject-matter, the effects and consequences, or from the reason and spirit of the law. Even where the language admits of two senses, each conformable to common usage, that sense should be adopted which, without departing from the literal import of the words, best harmonizes with the object which the framers of the instrument had in view. "Perhaps the safest rule of interpretation, after all, will be found to be, to look to the nature and objects of the particular powers, duties, and rights with all

the lights and aids of contemporary history, and give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed." (1 Story, Const. sec. 405 *a*.) This rule is subject to some qualifications, which it is here unnecessary to discuss. (Id. sec. 406.)

It was admitted upon the hearing of this case that many of the acts passed by the legislature of this state were attested by the assistant clerk of the house, or the assistant secretary of the senate, or by both assistants. We have taken the pains to examine the enrolled statutes on file in the office of the secretary of state, and find that at the first session of the legislature (1864–5) eight bills and joint resolutions were so signed; one at the session of 1866; two in 1867; eighty-one in 1869; eighty-four in 1871; forty-six in 1873; majority in 1875; seventy-one in 1877; ninety-seven in 1879; none in 1881; forty-six in 1883. The civil practice act and other equally important acts are so attested. The legislative and executive departments have always considered that the attestation of the assistant secretary of the senate and assistant clerk of the assembly was a sufficient compliance with the provision of the constitution.

At the different sessions of the legislature there have been many members who were prominent members of the constitutional convention, and they, with others, have always recognized and sanctioned this construction of the constitution. Among these names we mention James A. Banks, Israel Crawford, J. W. Haines, A. J. Lockwood, B. S. Mason, J. G. McClinton, H. G. Parker, F. M. Proctor, F. Tagliabue, and Charles W. Tozer. J. S. Crossman, a member of the convention, was afterwards lieutenant governor, and John H. Kinkead was governor.

At the session of the legislature in 1864–5, Charles W. Tozer was speaker of the assembly. In 1866, J. S. Crossman, as lieutenant governor, was the president of the senate, and James A. Banks was speaker of the assembly. In 1873 Israel Crawford was president *pro tem.* of the senate. In 1879 and 1881 John H. Kinkead was governor. We

glean from this history that the co-ordinate departments of the state government, including among its numbers several persons who were members of the constitutional convention, have for the past nineteen years construed the provision of the constitution as giving the authority to the assistant clerk of the assembly and the assistant secretary of the senate to sign the bills and joint resolutions which passed the respective houses. The people of this state have acquiesced in that construction, and it has received the apparent sanction of the courts, although it has never before, to our knowledge, been called in question. Property and other rights have vested, and ought not to be overthrown unless it is manifest that the construction given by the other departments is absolutely erroneous. Even in such cases courts of great ability have hesitated, and, in some extreme cases, refused, to declare the law unconstitutional. But, from the views we have expressed, it will be observed that we do not consider the construction, as given by the other departments, erroneous. We believe it is correct; still, if it is not free from doubt,—and that, it seems to us, is the most that can be said,—it is clearly our duty to give some weight to the construction which has been deliberately given by the legislative and executive departments. (*Evans* v. *Job*, 8 Nev. 338.) "Great deference is certainly due to a legislative exposition of a constitutional provision, and especially when it is made almost contemporaneously with such provision, and may be supposed to result from the same views of policy and modes of reasoning which prevailed among the framers of the instrument expounded." (*People* v. *Green*, 2 Wend. 275.)

The supreme court of the United States, when the power of the judges of that court to sit as circuit judges was called in question, said: "To this objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporary interpretation of the most forcible nature.

This practical exposition is too strong and obstinate to be shaken or controlled.   *   *   *   The question is at rest, and ought not now to be disturbed." (*Stuart* v. *Laird*, 1 Cranch, 308.)   In Georgia, when the question was raised as to the power of the governor of that state to veto bills after the adjournment of the legislature was called in question, the court said : "If this was an original question, independent of any construction heretofore given by the executive department of the state government to this clause of the constitution, we should be inclined to hold that the governor could not approve and sign any bill after the adjournment of the general assembly ; but, on looking into the past history of our legislation, we find that it has been the practice for many years for the governor to take five days after the adjournment of the general assembly for the revision of bills passed by that body, and to approve and sign the same within that time,   *   *   *   and that a large number of the most important acts now upon the statute-books of the state have been so approved and signed, which usage and practice of the executive department of the state government should not now, in our judgment, be disturbed or set aside." (*Solomon* v. *Com'rs*, 41 Ga. 161.)

The supreme court of Pennsylvania, in discussing the power of the legislature, under the provisions of the constitution of that state, to enlarge the privileges of corporations, said : "This construction is not unsupported by authority. It has not, indeed, received the direct sanction of any express judicial decision. But the legislature, with many members of the convention in it, has always acted upon this interpretation. And this has been done with the silent acquiescence of all the people, including the legal profession and the judiciary. The defendant's counsel has produced us a list of two hundred and seventy-nine acts of assembly, passed only within the last four years, creating one and enlarging the powers of another corporation, or enlarging the powers of two corporations, both municipal and private. Some thousands of such laws have probably been passed since 1838. If we now declare them to be

unconstitutional, and sweep away at once all the rights, public and private, which have been acquired under them, we must do an amount of mischief which no man's arithmetic can calculate. This is a proper element of legal judgment on such a subject. We are not to overlook the practice of the legislature, or disregard the consequence of doing so. (*Moers* v. *City of Reading*, 21 Pa. St. 202. To the same effect: *Bingham* v. *Miller*, 17 Ohio, 448; *Johnson* v. *Joliet & C. R. R. Co.* 23 Ill. 207; *Scanlan* . v. *Childs*, 33 Wis. 666; *Cronise* v. *Cronise*, 54 Pa. St. 263; *Com'rs* v. *Higginbotham*, 17 Kan. 80.)

These cases are cited and quoted as declaring principles which should govern courts where doubts exists as to the proper construction of the constitution. It is only in cases where the provisions of the constitution are free from doubt that courts follow the "fundamental law as it is written, regardless of consequences." In such cases courts have frequently declared that the argument *ab inconvenienti* should not "bend the constitution to suit the law of the hour." We agree with Judge Cooley that "we allow . to contemporary and practical construction its full legitimate force, where it is clear and uniform, to solve in its own favor the doubts, which arise on reading the instrument to be construed." (Cooley, Const. Lim. 71, and authorities there cited.)

Having decided that the act to remove the county seat to Hawthorne is valid, it becomes our duty to consider certain other questions, preliminary in their character, which relate to the provisions of the act requiring the funding commissioners to issue certain bonds. This act contains a proviso "that suitable grounds for the erection of such buildings (court-house and jail) thereon, at the town of Hawthorne, be donated to the county free from all incumbrances." (Stat. 1883, 105, sec. 4.) The deed to the county is executed by H. M. Yerington, as president of the corporation known as the Southern Development Company. It is contended that he had no authority to execute this deed, and that the deed is not a donation to the county of the land in

question.    The resolution passed by the trustees of the corporation is as follows :    "Resolved, that the president be and is hereby authorized, on behalf of the company, to deed and convey to purchasers, at his discretion, town lots in the town of Hawthorne."

Does this resolution authorize the president, on behalf of the corporation, to donate the land to the county ?    We think it does.    The use of the word "purchasers" was not intended to limit his authority to only convey land to those who paid a price or value for the same.    It is evident that the word "purchasers," as used in the resolution, is more extensive in its meaning.    In its broadest sense it includes the power to donate land, to execute a conveyance by gift, and all other modes of the personal acquisition of real property, except by descent or inheritance.    (2 Bl. Comm. 244 ; *Greer* v. *Blanchar*, 40 Cal. 197 ; 2 Whart. Law Dict. 356.) The words "at his discretion," give force and effect to this meaning.    The language of the deed is, "does grant, bargain, sell, and convey unto the said party of the second part, and to its successors and assigns forever, all of that certain real estate"—describing it—"for the purpose of erecting thereon county buildings, *to which the same is hereby dedicated* for the use and benefit of said party of the second part, its successors and assigns, forever."    The deed expresses a consideration of one dollar, but it is admitted that no money was paid.    It is claimed that the deed dedicates the land to a certain use, and that it is not a donation of the land to the county.    This is too narrow a construction to be adopted. The deed complies with the statute.    The land is donated to the county for the purpose of having county buildings erected thereon.    If used for such purpose, the county will own the land as absolutely as if it had obtained the same by purchase, without the words of dedication as expressed in this deed.

It is claimed that the land conveyed is incumbered by mortgage.    The mortgage in question was executed by the "Carson & Colorado Railroad Company," and conveys "all that certain railroad now owned and operated, or hereafter

to be constructed, owned and operated by the party of the first part in the State of Nevada." The line of the road is specifically designated. The mortgage includes "all the lands of an average width of sixty feet, more or less, upon which said railroad is located and built, or to be built, * * * which are or may be necessary for the use and operation thereof." It conveys all the stations, depots, and all superstructures of every kind, with the land upon which the same are situated, and all personal property used or to be used, by the railroad company in the working and operation of its road. After a minute description of the railroad is given, the following words are employed : "and all rights, privileges, franchises, and property whatever, now belonging or hereafter to belong to or to be acquired by said party of the first part." At the time this mortgage was executed, the Carson & Colorado Railroad Company owned the land, mentioned in the deed of the Southern Development Company to the county of Esmeralda. This land is not within sixty feet of the railroad. But it is contended, that by the use of the language last quoted, all property owned by the corporation wherever situate, was conveyed to the mortgagees. This construction cannot prevail. All the words employed in giving the description of the property mortgaged must be considered, in order to determine the meaning and intent of any particular clause or sentence.

Upon a careful reading of the entire instrument, we are clearly of the opinion that the mortgage only conveys such property, real and personal, as was or would be employed and be useful or necessary in the construction, maintenance, operation, preservation, repair, or security of the railroad mortgaged ; and that property owned by the Carson & Colorado Railroad Company not used, or to be used, in connection with the railroad, in promotion of the direct and proximate purposes of its construction, was not thereby conveyed. (*Morgan* v. *Donovan*, 58 Ala. 242.)

It is ordered that a peremptory writ of mandamus be immediately issued as prayed for by relator.